UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA            :
                                    :
        - v -                       :
                                    :           **19 CR 444 (RMB)**
**JOHN  DUPONT,**                   :
        Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**SENTENCING MEMORANDUM
ON BEHALF OF JOHN DUPONT**


                 DAVID PATTON, ESQ.
                 Federal Defenders of New York
                 Attorney for Defendant
                 **John Dupont**
                 52 Duane Street, 10th Floor
                 New York, NY 10007
                 Tel.: (212) 417-8735
                 **Zawadi Baharanyi**, Esq.
                 Of Counsel


TO:       Damian Williams, Esq.
           United States Attorney
           Southern District of New York
           1 St. Andrew's Plaza
           New York, NY 10007

Attn:     Alexander Rossmiller, Esq.
           Assistant United States Attorney

**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

November 24, 2021

**BY ECF**

Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: <u>**United States v. John Dupont**</u>
     **19 Cr. 444 (RMB)**

Honorable Judge Berman:

  For his conduct soliciting investments for political campaigns that he had no connection to and only marginally supported, Mr. Dupont has spent nearly every day of the last two years shackled in a hospital bed, mentally and physically deteriorating. He lives under the constant watch of the US Marshals at Windsor Park Nursing Home. Since his placement in custody, he has been hospitalized twice—first in 2019 following a fall and concussion, and more recently in October 2021 for cardiac arrest. John Dupont is 83 years old, frail, and sick.

  There is no question Mr. Dupont deserved to be punished for his conduct. He recognizes this and pleaded guilty to aggravated identity theft and wire fraud because of his poor choices. But, Mr. Dupont has been adequately punished and these two years in pretrial custody have satisfied the ends of sentencing. A sentence of time served is the most just and appropriate sentence given all of the factors the Court considers when crafting a just sentence: (1) Mr. Dupont's life and characteristics; (2) the nature and circumstances of the offense; (3) the conditions

inside the nation's jails and prisons during the COVID-19 pandemic; and (4) all of the additional Section 3553(a) factors.

Mr. Dupont requests a sentencing hearing by remote means in light of his serious underlying health issues, discussed more fully below, and his recent hospitalization for cardiac arrest. He is prepared to execute a waiver of his right to an in-person proceeding and we ask permission to proceed with a sentencing hearing on December 13 or the week of December 20.

## MR. DUPONT'S PERSONAL HISTORY AND CHARACTERISTICS

Long before John Dupont was an 83-year-old shackled in a bed at Windsor Park Nursing Home, he was John Gary Rinaldo. Born in 1938 in Niagra Falls, New York to William Joseph Rinaldo, a furniture store owner, and Pearl, a homemaker, John Dupont had an idyllic childhood. PSR ¶ 91. Mr. Dupont moved with his family to California after World War II. PSR ¶ 92. He was raised in a middle to upper class home. He never wanted for anything and as an only child, he received all of the attention of his parents.

John Dupont aspired for an equally idyllic life as an adult. But unlike his childhood, Mr. Dupont's adult years have been wrought with instability brought by his own reckless decision-making. Mr. Dupont started at a high in his life and career. In the 1970s, he founded the American Home Mortgage Company, an investment firm. The firm earned Mr. Dupont millions of dollars and a reputation as a top financier in California. But the firm's dealings were marred by fraud and corruption and, after a severe economic downturn, led to Mr. Dupont's first great fall– and incarceration. American Home collapsed and filed for Bankruptcy in 1984. The following year, Mr. Dupont took accountability for defrauding investors by pleading guilty to mail fraud. Significantly, the money that was initially lost by investors was returned through subsequent bankruptcy proceedings. For his conduct, Mr. Dupont was sentenced to three years in prison and served his time at Camp Lompoc.

Mr. Dupont had nothing when he was released from prison. His wife divorced him. His relationship with his only two children–John Jr. and Cathy–became strained and while he now has a relationship with his son, see Exhibit A (Letter from John Rinaldo, Jr.), he has never been able to rebuild a relationship with Kathy. PSR ¶ 93. Mr. Dupont moved in with a friend after leaving Camp Lompoc. With his personal and family life in shambles, he worked to regain financial stability, while hoping for a future of financial prosperity. Unfortunately, with his record, reputation and age (at this point he was 50 years old), Mr. Dupont found it difficult to rebuild and he fell back into the old habits that landed him in prison the first time. He would repeat this cycle of financial hardship, scams, and prison until his final release from prison in 2002.



After his release from prison in 2002, Mr. Dupont tried to live a quiet life. He played chess and enrolled in college courses in California. But an interest in politics and the elections of 2016 and 2018 took him out of the quiet life and back into business. Mr. Dupont worked with a small team to organize campaign calls and promote certain causes but in doing so he fell back into old habits which have now brought him back to a federal court nearly twenty years after his last contact with the criminal justice system.

---

[1] "Cellmate Testifies in Levine Trial," *Chicago Tribune* (June 28, 1991), *available at:* https://www.chicagotribune.com/news/ct-xpm-1991-06-28-9102270022-story.html

## JOHN DUPONT'S OFFENSE CONDUCT

Beginning in 2015, in the lead up to the 2016 elections, Mr. Dupont worked with a small team to create websites and solicit donations for various political causes and political candidates. He used the names of these candidates to request donations. Some of this money went towards fundraising calls and fliers for these candidates. Much of it did not. Mr. Dupont used the money he received to buy a car, pay his rent, and for other personal needs unrelated to the candidates he purported to support. The vast majority of donations ranged between $20 and $100.00. These donations intended for political candidates functioned instead to supplement Mr. Dupont's fixed income from social security.

Mr. Dupont is deeply remorseful for his conduct and regrets deceiving donors and depriving candidates that he genuinely believed in from the full economic support of the donations he received.

## JOHN DUPONT'S DETERIORATING HEALTH

Mr. Dupont is a sick, 83-year-old man, who has been in federal custody since November 2019. He began his pretrial confinement at the MCC New York but his stay there was brief. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████
       ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

4



5







The Bureau of Prisons (BOP) is not a place where Mr. Dupont can be expected to receive consistently adequate medical care. BOP facilities are severely understaffed and under-resourced and as a

result, detained individuals in the care of the BOP routinely receive diminished quality of medical care.[3]

## THE APPLICABLE SENTENCING LAW AND THE ADVISORY GUIDELINES

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." <u>United States v. Cavera</u>, 550 F. 180, 188 (2d Cir. 2008) (en banc). In reaching its sentencing decision, a court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220, 245-46 (2005); <u>Gall v. United States</u>, 552 U.S. 38, 59 (2007). The Court should begin by calculating the applicable Sentencing Guidelines range.

Here, the parties and Probation agree that Mr. Dupont has an advisory Sentencing Guidelines range of 75 to 87 months, which includes a 24-month consecutive sentence for the aggravated identity theft count.

Although the Court must begin by calculating these Guidelines, they "are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." <u>Nelson v. United States</u>, 129 S. Ct. 890, 892 (2009). Rather than relying on the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented and in light of each of the factors set forth in § 3553(a). "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." <u>United States v. Singh</u>, 877 F.3d 107, 121 (2d Cir. 2017)(second internal quotation marks omitted).

---

[3] *How Poor Pay and Bad Planning Has Led to Diminished Medical Care for Federal Prisoners*, Government Executive, *available at*: https://www.govexec.com/pay-benefits/2016/03/how-poor-pay-and-bad- planning-has-led-diminished-medical-care-federal-prisoners/127029/.

In light of Mr. Dupont's poor and deteriorating health, a below guideline sentence of time served is sufficient, but not greater than necessary, to serve the ends of sentencing. Moreover, Mr. Dupont's advanced age—83-years old— warrants a downward departure pursuant to U.S.S.G. § 5H1.1 ("Age"). 5H1.1 states, "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." There is no question that at 83 years old, Mr. Dupont is elderly and infirm. He has grown weaker since his placement in federal custody in November 2019. A downward departure based on his age and infirmity is thus warranted.

## THE REASONS THIS COURT SHOULD IMPOSE A SENTENCE OF TIME SERVED

Considering all of the § 3553(a) factors, this Court should impose a sentence of time served, which amounts to 24 months. Although the advisory guidelines recommend further imprisonment, the guidelines fail to reflect the uniquely precarious nature of Mr. Dupont's health, advanced age, and short life expectancy.

### a. The nature of the offense warrants a sentence of time served

A sentence of time served— 24 months— is appropriate in light of the circumstances of the offense. Mr. Dupont. This is not a case where victims were defrauded out of their life savings or retirement. The average donation amount was under $100 and most were from one-time donors. Moreover, some of the donated funds did in fact support the political candidates and campaigns by maintaining websites that provided candidate and election information and financing call banks on behalf of the candidates. The conduct in this case is far less egregious than many wire fraud and aggravated identity theft schemes. For his conduct, Mr. Dupont has been punished seriously with two years in pretrial detention, during a global health pandemic.

### b. **Mr. Dupont's age and health warrant a time served sentence**

Similarly, an evaluation of Mr. Dupont's age and declining health warrant a sentence of time served. Mr. Dupont is 83 years old. By Dr. Kush's assessment, Mr. Dupont is expected to live fewer than three more years because of his physical condition. This may be an overly optimistic assessment given his recent hospitalization.[4] To put it bluntly, there is a real risk Mr. Dupont will not survive further incarceration.

As we are increasingly recognizing as a society, it is unnecessary and inhumane to incarcerate older people. The elderly pose less of a danger to society than other individuals. Even if people have previously committed crimes, and even if they have committed crimes into middle age, their likelihood of committing another crime continues to decrease as they get older. See, e.g., U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, 12 & Exhibit 9 (May 2004) ("Recidivism rates decline relatively consistently as age increases. . . . [O]ffenders over age 50 have a recidivism rate of 9.5 percent."); William Rhodes, et al., Recidivism of Offenders on Federal Community Supervision, U.S. Dep't of Justice, Bureau of Justice Statistics, at 13 (Dec. 21, 2012) (finding that older offenders are less likely to be arrested for a new offense). Should the Court sentence Mr. Dupont to further prison, he will be in grave danger. Any greater term of imprisonment will be disastrous for his overall health and well-being, given the effect prison has on even a healthy person's life expectancy. See Jenkins, 854 F.3d at 186 n.2 ("We do know that, as a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration.") (citing Evelyn J. Patterson, The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003, 103 Am. J. of Pub. Health 523, 526 (2013)); see also Office of the Inspector General, U.S. Dep't of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, 1–2 (May 2015; Revised February 2016) ("OIG Aging Inmate Report")

---

[4] Dr. Kush is in the process of updating his life expectancy report using the records from Mr. Dupont's Long Island Jewish Medical Center, the site of his most recent hospitalization.

("Several studies . . . state that an inmate's physiological age averages 10–15 years older than his or her chronological age.").[5]

Beyond the general risk to older people, Mr. Dupont is particularly vulnerable. Dr. Kirchner described Mr. Dupont as "frail" and explained that this is a designation that means he is likely to continue experiencing poor health outcomes. This is especially true in the high stress context of prison. Mr. Dupont has survived 24 months in custody. But more prison would be severely mentally and physically stressful for Mr. Dupont. Imprisonment reduces an individual's life expectancy for a variety of reasons, including increased stress, poor diet, limited ability to exercise, unclean living conditions, and greater exposure to disease and violence. Mr. Dupont experienced many of these life shortening limitations while in custody at Windsor Park Nursing Home. At the nursing home, he has not been permitted to walk outside and securing a health-appropriate diet required months of advocacy and the involvement of Juliana Nunez, an Ombudsman from the Center for Independence of the Disabled in New York. For most of his pretrial confinement, he has been housed in a small room with two or three other in-custody individuals in a room with poor air flow and poor sanitary conditions.

Mr. Dupont's experience in custody is only likely to get worse, not better, with more incarceration. The elderly are more prone to abuse and predation in prison, they need more frequent medical care, they often require special physical accommodations (as their mobility, vision, and hearing diminish), and they experience greater emotional distress. Prison both increases the suffering of the elderly and reduces their life expectancy.

The Department of Justice has recognized the Bureau of Prison's limitations in caring for elderly prisoners like Mr. Dupont. In a 2015 report (revised in 2016), the Department of Justice found that, "a growing aging inmate population has an adverse impact on the BOP's ability to provide a safe, humane, cost-efficient, and

---

[5] Available at https://oig.justice.gov/reports/2015/e1505.pdf (last visited Nov. 24, 2021).

appropriately secure environment for aging inmates and to assist aging inmates reentering the community." See Office of the Inspector General, U.S. Dep't of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, 51-53 (May 2015; Revised February 2016) ("OIG Aging Inmate Report"). The report cites a myriad of issues, including staffing shortages, inadequate staff training, limitations in housing and physical infrastructure, and inadequate use of compassionate release for elderly offenders. Id.

The stress of any additional imprisonment with the Bureau of Prison, beyond what has already been imposed in pretrial confinement, would be devastating to someone of Mr. Dupont's advanced age and health.

 c. **A sentence of time served is appropriate in light of the ongoing COVID-19 pandemic and its impact on prisons**

A sentence of time served is particularly appropriate in Mr. Dupont's case, due to the heightened risk of illness and death that he faces with continued incarceration during the COVID-19 pandemic. It is well documented that COVID-19 remains a significant danger within BOP facilities. Since the beginning of the pandemic, 42,397 incarcerated people in BOP facilities have tested positive for COVID-19 and 266 have died from this disease.[6] As of November 24, 2021, there were 107 people incarcerated in BOP facilities and 258 BOP staff members who had confirmed positive COVID test results.[7] Additionally, 64 BOP facilities are currently classified at Modified Operational Level 3 – the most severe level of modified operations – based on a multi-factored evaluation of COVID-related risk at each facility.[8] The list of Level 3 facilities includes the Brooklyn Metropolitan Detention Center (MDC).[9]

Research consistently demonstrates that the risk of contracting COVID-19 is significantly higher for people confined in prisons than for the overall US

---

[6] Statistics available at: bop.gov/coronavirus/ (last visited Nov. 24, 2021).
[7] Id.
[8] Id.
[9] Id.

12

population. One study analyzed counts of COVID-19 cases and deaths among incarcerated people in all 50 states and the Federal Bureau of Prisons from April 5, 2020 to April 3, 2021.[10] It found that during this period, the cumulative incidence rate of COVID-19 cases per 100,000 persons was 30,780 cases for the prison population and 9,350 for the general US population.[11] The mortality rate per 100,000 persons was 199.6 deaths for the prison population and 80.9 deaths for the general US population.[12] Further, this study does not even capture the impact of more recent outbreaks due to the Delta variant.

A study by the Centers for Disease Control analyzed such an outbreak of the Delta variant in a federal prison in Texas. The outbreak occurred between July 12, 2021 and August 14, 2021, and it infected 172 out of 233 incarcerated people in two housing units at the facility.[13] While the infection rate was higher among unvaccinated than vaccinated people, significant majorities of both groups were infected: 93% of unvaccinated people in prison and 70% of those who were vaccinated.[14] These findings demonstrate the high potential for Delta variant outbreaks in prison settings, "even among resident populations with high vaccination coverage."[15] Thus, while progress has been made in fighting the pandemic and increasing the portion of the US population that is fully vaccinated, prisons remain high-risk settings for the spread of COVID-19. The threat of infection, for incarcerated people in particular, has by no means subsided. The following image depicts active COVID-19 cases in federal prisons across the country:

---

[10] Marquez, et al., *COVID-19 Incidence and Mortality in Federal and State Prisons Compared With the US Population, April 5, 2020, to April 3, 2021*, (2021, Oct. 6), available at: https://jamanetwork.com/journals/jama/fullarticle/2784944
[11] *Id.*
[12] *Id.*
[13] Centers for Disease Control and Prevention, *Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison—Texas, July-August 2021*, (2021, Sept. 21), available at: https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e3.htm
[14] *Id.*
[15] *Id.*

13



*Available at*: https://uclacovidbehindbars.org/

      Mr. Dupont would face a significant risk of becoming infected with COVID-19 if sentenced to a period of incarceration beyond the two years he has already spent in custody. It is now common knowledge that the elderly are more vulnerable to serious illness and death if exposed to COVID-19.[16] Even for vaccinated individuals, break through infections for COVID-19 can be deadly. Mr. Dupont is at even greater risk of serious illness from COVID-19 given the myriad of other underlying health conditions that he suffers from. █████████████████

██████████████



Exhibit F.

      For the reasons discussed above, this case does not warrant exposing John Dupont to this unnecessary danger.

---

[16] Center for Disease Control, "Increased Risk of Severe Illness from COVID-19," available at: https://www.cdc.gov/aging/covid19/covid19-older-adults.html (last visited Nov. 24, 2021).

### d. A sentence of time served is appropriate in light of Mr. Dupont's family support upon release

John Rinaldo Jr. is the unexpected silver lining of Mr. Dupont's arrest and conviction in this matter, and another reason why this Court should impose a sentence of time served. Mr. Dupont is the first to admit that he has not always been a good father to his son. His actions in the past, just like his actions in this case, have too often forced distance between him and his family, leaving his children without a steady fatherly presence. Fortunately for Mr. Dupont, when John Jr. learned of his father's most recent incarceration and his declining health, he immediately put aside their past issues and has been a source of steady support. He sends his father books at the nursing home and photographs of Mr. Dupont's grandsons. And most importantly, he has eagerly agreed to be an integral part of Mr. Dupont's reentry plan.

Mr. Rinaldo is prepared to take his father into his home upon his release and help him transition into a nursing home or senior living facility near him. <u>Exhibit A</u>. John Jr. lives in Ventura, California and is an administrator of a local urgent care clinic. He is also a veteran of the U.S. Air Force and was a flight nurse for sixteen years. He can personally escort his father to his home in California if needed and he has the background to ensure that his father is receiving proper care upon his release. With his son's support, Mr. Dupont can live out his remaining years safely, with family, and in compliance with the law.

### CONCLUSION

Considering each of the above factors, a sentence of time served is most appropriate. Mr. Dupont is deeply sorry for deceiving donors and depriving worthwhile political candidates and causes of the full benefit of the solicited donations. He has learned his lesson from these two years in pretrial detention—the two hardest years he has spent in custody. More time in prison is not necessary and only increases the likelihood that Mr. Dupont dies in confinement. While many may disagree on whether any case warrants the indignity of dying custody, there

can be no question that the facts of this case should not yield such a result. I ask that the Court sentence Mr. Dupont to time served and allow him to use the years he has remaining to enjoy his rekindled relationship with his son and grandkids in his home state of California.

Thank you for your consideration of this request.

> Respectfully submitted,
>
> */s/ Zawadi Baharanyi*
>
> _____
> Zawadi Baharanyi, Esq.
> Assistant Federal Defender
> Federal Defenders of New York

Cc: AUSA Alexander Rossmiller.