UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | | 19 Cr. 444 (RMB) |
| - v. - | : | |
| | | |
| JOHN PIERRE DUPONT, | : | |
| | | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

<div style="text-align:right">

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

</div>

Alex Rossmiller
Assistant United States Attorney
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| - v. - | :  19 Cr. 444 (RMB) |
| JOHN PIERRE DUPONT, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The Government respectfully submits the following memorandum in connection with the sentencing of John Pierre Dupont, a/k/a "John Gary Rinaldo," a/k/a "John Gary," in the above-captioned case, and in response to the defendant's sentencing memorandum dated November 24, 2021 ("Def. Mem.").

Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), and as set forth in the plea agreement dated June 17, 2021 (the "Plea Agreement"), the applicable sentencing range is 75 to 87 months of imprisonment.

For the reasons set forth below, the Government submits that a sentence within the stipulated guidelines range of 75 to 87 months of imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a), and that a very significant term of incarceration is appropriate and warranted to serve those purposes of sentencing.[1]

---

[1] No sentencing date has been set; the Government joins in the defendant's request that a sentencing hearing be scheduled on December 13 or during the week of December 20. Def. Mem. at 2. The Government also does not oppose the defendant's request for a remote sentencing proceeding. *Id.*

**Background and Investigation**

A.   **The Offense Conduct**

1. Overview

The defendant's underlying conduct in this case was calculated, sophisticated, and predatory, and his conduct following his arrest was significantly obstructive.

Over the course of years, from approximately 2015 up to his arrest in 2019, the defendant defrauded more than 2,000 victims of nearly a quarter million dollars. In short, the defendant set up fraudulent political action committees, and then falsely impersonated campaigns and candidates, to solicit—and then steal—donations to those causes and campaigns. The defendant shamelessly and repeatedly exploited individuals who passionately believed in the policies of certain candidates for public office, and the Government is not aware of any evidence that the defendant spent a single dollar of the money on the campaigns or causes the defrauded donors believed they were supporting. Rather, the entirety of the money was either taken by the defendant himself, or else used to perpetuate the fraud through additional fundraising expenditures.

2. Background on PACs and Relevant Entities

A political action committee, or "PAC," is a type of political organization that can raise money to direct toward, for example and among other things, political parties, electoral campaigns, or issue-related expenditures. Under federal campaign finance laws and regulations, such committees must register with the FEC and periodically report their financial activities. FEC registration can be accomplished by filing a form with the FEC that principally identifies the PACs name, physical address, email address, internet website, and associated banking information.

FEC rules require periodic public financial disclosures of the amounts of money received by PACs. FEC rules also require periodic public disclosures of PACs' expenditures, listed by amount and category of spending.

3. <u>The Defendant's Scam PACs and Associated Websites</u>

The defendant registered three fraudulent political action committees that he used to perpetrate his crimes. In September 2015, the defendant established "Businessmen for a Businessman President PAC." In its public FEC filings, it listed "John Pierre duPont" as both its treasurer and its custodian of records. In October 2018, the defendant established the "Foundation for Sanity in Politics PAC." In its public FEC filings, it listed "John duPont" as both its treasurer and its custodian of records. And in August 2018, the defendant established "Democrats for Congress PAC." In its public FEC filings, it listed "John Pierre Dupont" as its treasurer and "John Gary Rinaldo" as its custodian of records.

Additionally, the defendant established approximately 15 separate websites in connection with the fraudulent scheme, including the following (collectively, the "Websites"), each of which, unless otherwise specified, identified itself in website text as being associated with "Democrats for Congress" and/or the Democrats for Congress PAC:

a. DemocratsForCongress.com (the "Democrats Congress Website"), which purported to be raising money to support Democratic candidates for the United States House of Representatives;

b. DemocratsForSenate.org (the "Democrats Senate Website"), which purported to be raising money to support Democratic candidates for the United States Senate;

c. Websites with titles of Beto4Senate (the "Beto Website"), BredesenForSenate, DonnellyForSenate, ManchinForSenate, McCaskillForSenate, HeitkampForSenate, StabenowForSenate, Nelson4Senate, RosenForSenate, and SinemaForSenate (collectively, the "Candidate Websites"), each of which respectively purported to be raising money to support particular candidates for the United States Senate;

4

   d. Sanders2016Campaign.com (the "Sanders Website"), which was created in 2015 and identified itself as being associated with "The Sanders Organization," and which purported to be raising money to support the 2016 candidacy of Senator Bernie Sanders for president of the United States; and

   e. ImmigrantChildrenReunited.org (the "Immigrant Children Website"), which identified itself as being associated with Sanity in Politics PAC, and which purported to be raising money "to unite immigrant families" and provide services in connection with certain United States immigration policies.

 All of the Websites were registered under the same customer account, with the contact name "John DuPont/Rinaldo."

  4. <u>The Defendant's False Representations in Solicitations by Scam PACs and Websites</u>

 The Democrats Congress Website claimed to raise money in support of certain federal congressional campaigns. It contained an electronic form through which individuals could, based on representations made on the Democrats Congress Website, supposedly donate money to, or in support of, certain congressional candidates. In reality, those representations were entirely false. Bank and financial records associated with the defendant do not reflect *any* of the donated money being provided to, or used to support, congressional candidates. Additionally, a section of the Democrats Congress Website touted that it represented a coalition of organizations, none of which in fact existed as described.

 The Democrats Senate Website claimed to raise money for certain federal Senate campaigns, and it contained an electronic form through which individuals could, based on representations made on the Democrats Senate Website, supposedly donate money to, or in support of, Democratic candidates for the U.S. Senate. Here, too, those representations were entirely false.

5

Bank and financial records associated with the defendant do not reflect any of the donated money being provided to, or used to support, Senate candidates.

The Immigrant Children Website, which identified itself in website text as being associated with Sanity in Politics PAC, purported to be raising money in connection with certain United States immigration policies relating to the separation of undocumented immigrant family members in the course of immigration proceedings. Specifically, the Immigrant Children Website claimed that: "Our volunteer attorneys, doctors, nurses and social workers are working day and night to liberate these children." It further claimed that: "Donations will go to help pay our volunteer attorneys', doctors', nurses' and social workers' costs and pay for transportation to unite immigrant families." In fact, not a single one of those claims was true. Sanity in Politics PAC had no such volunteers, or any other employees or operations, and neither Sanity in Politics PAC nor the defendant made any expenditures whatsoever toward any such volunteer, transportation, or other related efforts.

Each of the Candidate Websites purported to support its respective candidate for office by, among other things, including the text "Support [Candidate] TODAY" above a link with the text "DONATE" that led to an online donation portal. Additionally, each of the Candidate Websites stated that it was paid for by the Democrats Congress PAC, and each further stated that: "Your donations are collected by DFC [Democrats for Congress PAC] and combined with other donations and allocated by DFC to support [the candidate's] campaign within 72 hours." Here again, that statement was entirely false. The donations made through the Candidate Websites were not transferred to campaigns, and they were not used to support candidates or their campaigns.

The Sanders Website stated, among other things, that: "We are a non profit corporation (The Sanders Organization)" that was "organized to support the candidacy of Bernie Sanders for President" and that "[y]our money will support Progressive Democrat Presidential Candidate Bernie Sanders." This was also entirely false. None of the money donated to the purported

6

"Sanders Organization" went to support the candidacy of Senator Bernie Sanders; rather, it was all taken by the defendant.

       5.    <u>Fraudulent Communications by the Defendant with Certain Donors</u>

In furtherance of his scheme to defraud donors, the defendant sometimes falsely represented himself to donors as being associated with the campaigns of certain candidates in whose names he established the fraudulent websites. For example, the defendant wrote multiple emails to donors with the signature: "Sincerely, Robert Francis 'Beto' O'Rourke(D) U.S. Senator For Texas." Another email to a donor, signed by "John Dupont, Director" falsely claimed that a donation "went directly to the Heirkamp [sic] campaign." That email also claimed that "we have utilized the donations to support our ground activities" and that "[w]e have deployed an attorney and three volunteers" in connection with the campaign. In reality, the defendant disbursed zero funds to the Heitkamp campaign for Senate, and there were no such ground activities, attorneys, or volunteers being paid for or organized by the Democrats Congress PAC, by the defendant himself, or by any other organization associated with, or receiving funds from, the defendant.

Similarly, another email to a donor, signed in the name "John Dupont," claimed that a particular donation had gone to the "Beto [O'Rourke] Campaign," and stated that the PAC was "bundling your donation and within 72 hours allocates the funds donated to the Beto O'Rourke campaign" and that "we have disbursed your funds to the Beto advertising campaign." All of those statements were false. The defendant sent no funds to the O'Rourke campaign, or to any advertisements for the campaign.

The defendant's goal was to be sufficiently high on internet search results to trick victims into donating to what they believed were the actual candidates or campaigns, or to PACs that would support those campaigns. Indeed, on October 25, 2018, just days before the 2018 Election Day, the defendant sent an email to an individual who self-identified as an "online marketing

7

Case 1:19-cr-00444-RMB   Document 65   Filed 12/04/21   Page 8 of 17

consultant" with the subject "Re: 1st Page of GOOGLE." The email stated: "Is there a way to get me to the top of the search right now? I don't care if google or microsoft BING bars me. We are running a political campaign which will be over in 12 days. So I only need to be there for 7 days. We will pay very, very well!" Needless to say, the defendant was not "running a political campaign," but rather running a sophisticated fraudulent scheme for which internet search results played a critical role.

&#x20;&#x20;&#x20;&#x20;&#x20;6. <u>Theft of the Donations</u>

The defendant's Scam PACs had no operations whatsoever beyond their associated websites, online and email solicitations, and donation processing. There was no "there" there for any of the defendant's operations; the entirety of the setup was to commit fraud. Based on an extensive review of thousands of the defendant's emails, bank account data for several accounts affiliated with the Scam PACs and the defendant, and other records, there is no evidence whatsoever of any of the following: advocacy campaigns; political operations; employees of the Scam PACs; volunteers associated with the Scam PACs or the causes espoused in the Websites; outreach to political organizations, media, or other advocacy organizations; or political contributions made in support of candidates or issue-based organizations.

The Scam PACs and the associated Websites received donations via credit card payments processed through multiple payment-processing entities. In email communications with one of those payment processors, the defendant, identifying himself as "John Dupont, Custodian of Records and Treasurer," represented that the Democrats Congress PAC was raising money to, among other things, "put volunteers [. . .] in registering Democrats in [certain] districts and provide advertising such as bill boards, yard signs and bumper stickers. . . . We are knocking on doors and registering thousands of Hispanic voters." As described above, no such operations existed. Another of the defendant's accounts with a payment processor was registered in the name of Sanity

8

consultant" with the subject "Re: 1st Page of GOOGLE." The email stated: "Is there a way to get me to the top of the search right now? I don't care if google or microsoft BING bars me. We are running a political campaign which will be over in 12 days. So I only need to be there for 7 days. We will pay very, very well!" Needless to say, the defendant was not "running a political campaign," but rather running a sophisticated fraudulent scheme for which internet search results played a critical role.

     6. <u>Theft of the Donations</u>

The defendant's Scam PACs had no operations whatsoever beyond their associated websites, online and email solicitations, and donation processing. There was no "there" there for any of the defendant's operations; the entirety of the setup was to commit fraud. Based on an extensive review of thousands of the defendant's emails, bank account data for several accounts affiliated with the Scam PACs and the defendant, and other records, there is no evidence whatsoever of any of the following: advocacy campaigns; political operations; employees of the Scam PACs; volunteers associated with the Scam PACs or the causes espoused in the Websites; outreach to political organizations, media, or other advocacy organizations; or political contributions made in support of candidates or issue-based organizations.

The Scam PACs and the associated Websites received donations via credit card payments processed through multiple payment-processing entities. In email communications with one of those payment processors, the defendant, identifying himself as "John Dupont, Custodian of Records and Treasurer," represented that the Democrats Congress PAC was raising money to, among other things, "put volunteers [. . .] in registering Democrats in [certain] districts and provide advertising such as bill boards, yard signs and bumper stickers. . . . We are knocking on doors and registering thousands of Hispanic voters." As described above, no such operations existed. Another of the defendant's accounts with a payment processor was registered in the name of Sanity

in Politics PAC, and was described as being to "[p]romote various political and social campaigns" and to "[p]rovide volunteer and other opportunities and requests for help and donations from registered Democrats."  Again, no such operations existed.

In total, well over $200,000 in donated funds were delivered to the defendant through his payment processors.  The funds were transmitted to bank accounts that were utilized as the defendant's personal banking accounts, *i.e.*, not accounts associated with any political candidate or political committee.  Expenditures from those accounts were primarily for personal purchases or for expenditures in connection with furthering the fraud.  For example, in February 2016, the defendant wrote two checks from an account in the name of the Sanders Organization, totaling $25,300, to an auto dealership for a Mercedes-Benz sedan.  Several additional checks written from the Sanders Organization account, as well as from an account in the defendant's name that received donated money, have memo lines that include the word "Rent," and other memo entries include "IT" or "website."  The defendant also used the Sanders Organization account to purchase internet advertisements, and for significant cash withdrawals.

### B. The Defendant's Bail Jumping and Obstructive Conduct

After being charged in this case, the defendant was arrested in California on March 18, 2019.  He was presented on March 19, 2019.  Following the presentment, the defendant was released on conditions of bail, and was ordered to appear in the Southern District of New York on March 25, 2019, at 10:00 a.m.  The defendant signed an "Acknowledgement of Defendant" form agreeing to the terms of his bail at the time he was released, including that he was "aware of the conditions of release" and promising "to obey all conditions of release [and] to appear as directed.

Rather than appearing as required in the Southern District of New York, the defendant fled, leading law enforcement officers on a months-long chase and employing sophisticated means to avoid capture.  On March 23, 2019, just days after the defendant was released on bail, he rented a

U-Haul truck at a location in Arizona, nearly 90 miles away from his home. The defendant rented the "moving van" truck with capacity to tow his Mercedes sedan, which had been purchased with proceeds of his fraud, and he entered into a contract with U-Haul for a one-way trip to Tukwila, Washington, to arrive on March 28, 2019—three days after he was scheduled to appear in this District. Tukwila is approximately 1,300 miles from the defendant's home and is a short drive to the Canadian border. This stated destination, however, was a ruse, presumably designed to mislead law enforcement. In fact, the defendant drove to Texas, where the U-Haul truck was found abandoned in late March 2019. In the months following the defendant's flight, he was identified—through use of credit and debit cards, surveillance video, license plate readers, and other methods—as having traveled in at least California, Arizona, New Mexico, Texas, and Oklahoma.

On October 27, 2019, after more than seven months of eluding law enforcement, the defendant was driving a Honda CRV in Oklahoma and was pulled over for failing to stop at a stop sign. In that traffic stop, the defendant claimed, falsely, his name was "John Reynolds." Subsequently, in response to being asked his name during booking, the defendant stated, again falsely, that his name was Michael Reynolds.

### C.   The Defendant's Criminal History

In 1985, the defendant was convicted of mail fraud, in the Central District of California, and was sentenced to three years of imprisonment. In 1991, the defendant was convicted of bank fraud and money laundering, in the Central District of California, and was sentenced to 46 months of imprisonment. In 1995, the defendant was convicted of providing a false identification to peace officers, fraud, and unauthorized use of a vehicle, in California, and was sentenced to three years of imprisonment. In 1998, the defendant was convicted of grand theft, in California, and was sentenced to nine years of imprisonment.

### D. The Defendant's Plea, Guidelines Range, and Restitution and Forfeiture

On March 13, 2019, the defendant was charged by complaint with one count of wire fraud, in violation of Title 18, United States Code, Section 1343, and one count of aggravated identity theft, in violation of Title 18, United States Code, Section 1028A. The defendant was indicted on those same two counts on June 13, 2019 (the "Indictment"). On July 29, 2021, the defendant pled guilty to both counts in the Indictment pursuant to the Plea Agreement with the Government.

As agreed by the parties, and as calculated by the Probation Office, the defendant's stipulated Guidelines Range is 75 to 87 months of imprisonment (the "Guidelines Range"). (*See* PSR ¶¶ 6, 125.)

The Probation Office recommends the defendant be sentenced to 75 months' imprisonment, followed by three years of supervised release. (PSR at 27-29.)

As set forth in the Plea Agreement, and in accordance with 18 U.S.C. §§ 3663 and 3664, the Government seeks restitution in the amount of $245,000. The Government intends to submit under separate cover a proposed Order of Restitution, a copy of which will be provided to the Court with an attached schedule of victims and corresponding loss amounts.

Also as set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $245,000. This Court previously entered a preliminary Consent Order of Forfeiture, *see* Dkt. 53, consistent with this request and with the consent of the defendant.

The maximum fine of twice the pecuniary gain is $490,000, and the Guidelines fine range is from $20,000 to $200,000.

**Discussion**

A. **The Defendant's Conduct Warrants a Term of Imprisonment Within the Stipulated Guidelines Range**

For the reasons set forth below, consideration of the relevant factors under 18 U.S.C. § 3553(a) weighs heavily in favor of a sentence within the Guidelines Range—that is, a substantial term of incarceration. In particular, the nature and seriousness of the offense and the need to promote respect for the law and afford adequate deterrence, both specific and general, are the most significant factors here. As described below, the defendant's age and health circumstances, which are meaningful mitigating factors, are nevertheless far outweighed by the aggravating considerations of both the offense here and the defendant's very significant criminal history.

1. The Defendant's Health

The bulk of the defendant's sentencing arguments focus on the defendant's health. *See generally* Def. Mem. at 4-8, 10-12. The Government recognizes that the defendant is in poor health, and acknowledges that this is unquestionably a meaningful factor that the Court can and should consider under 18 U.S.C. § 3553(a). The defendant certainly was mentally and physically fit enough just two years ago to perpetrate a massive fraud over the course of years and then evade arrest for several months; however, it appears that his health has deteriorated in the interim. Nevertheless, the defendant's request for a time-served sentence should be denied, and, for the reasons set forth below, he should be sentenced to a term of imprisonment within the stipulated Guidelines Range. The defendant committed a massive, lengthy, damaging fraud, and the fact that he did so in his older years, leading up to being in ill health, should not result in a disproportionate windfall in his sentence.

2. <u>The Nature and Seriousness of the Offense</u>

The breadth of the defendant's wrongdoing and the effect on more than two thousand victims across the country warrant a sentence within the Guidelines Range. Without question, the scope of the defendant's lies, and the targeting of individuals who passionately believed in the causes the defendant cynically exploited, make clear that the defendant has committed an extremely serious offense.

The defendant profited from exploiting one of the most important acts of civic contribution that a person may undertake: support of a political or charitable cause. The defendant targeted donors who cared deeply about these causes, and he capitalized on their generosity. At bottom, the defendant solicited and received hundreds of thousands of dollars, from an extraordinary number of people, and directed those donations not to the purported causes, but instead to himself and to the further perpetuation of the fraud. And after he was caught, he obstructed the criminal justice process by jumping bail and evading prosecution for more than six months.

Victims who contributed their hard-earned money to the defendant's Scam PACs believed their donations would be used to support political and charitable causes in the ways suggested by the Scam PACs' advertisements and solicitations. That belief and trust was exploited by the defendant. Well-meaning donors were susceptible to the defendant because of their personal feelings about issues and candidates the PACs and Websites purported to support. The defendant's scheme exploited those loyalties, and he spent *none* of the funds raised in furtherance of them.

To facilitate this extensive fraud, the defendant lied over and over again. He lied in his filings to the FEC, he lied in every one of the 15 websites he set up, he lied in his emails to donors, and he lied to payment processor companies. Later, he also lied to the court that granted him bail when he promised to obey his conditions of release. And, as discussed further below, the Government is unable to verify certain claims made by the defendant in his sentencing submission.

The defendant's conduct in committing the offenses does not reflect individual moments of poor judgment—the defendant lied for *years*, and did so in a thorough and prolonged manner that demonstrates significant premeditation and careful consideration rather than accidental or incidental transgression. He was not naïve, careless, or inexperienced; rather, he made calculated decisions to take money from people who passionately believed in candidates and causes they thought, wrongly, would be supported by their donations to the defendant's Scam PACs.

The defendant claims that some amount of the donations—left unquantified in the defendant's submission—went to "fundraising calls and fliers for [the] candidates," Def. Mem. at 4, and that "some of the donated funds did in fact support the political candidates and campaigns by [. . .] financing call banks on behalf of the candidates," Def. Mem. at 9. The Government is not aware of any evidence that would suggest those claims are true. As described above, an extensive review of thousands of the defendant's emails and of bank data for several accounts affiliated with the Scam PACs and the defendant revealed nothing that appears to show any expenditures for call banks or fliers. Moreover, in approximately 40,000 emails to and from six email accounts the defendant utilized, obtained by the Government through search warrants, searches for the phrases "call center" and "call bank" return zero substantive results. A search for the word "flier" similarly returns no substantive results. Additionally, the Government is not aware of any bank transfer or check records that show any such expenditures. While it is possible there is evidence of such legitimate use of the donated funds, the Government is not aware of any. Based on the evidence available to the Government, the defendant did not deprive causes and candidates of "the full economic support of the donations he received," Def. Mem. at 4, or "the full benefit of the solicited donations," Def. Mem. at 15. Rather, he deprived the candidates—and stole from the donors—*the entirety* of the donations he fraudulently solicited.

14

The defendant also asks the court to believe that the funds supported the candidates "by maintaining websites that provided candidate and election information." Def. Mem. at 9. In reality, the websites were rudimentary, limited, boilerplate, and, most importantly, were necessary for—and coextensive with—the fraud itself. A number of the Websites contained purported quotes from the candidates; in every case, the quotation was fake. And otherwise, no substantive information was provided, and the entirety of the purpose of the Websites was to raise money, that the defendant would then steal.

      3.   <u>The Need to Promote Respect for the Law and to Afford Adequate Deterrence</u>

The importance of promoting respect for the law and affording adequate deterrence further supports imposition of a sentence within the Guidelines Range. Given the magnitude, breadth, and scope of the conduct in this case, including the extraordinary number of victims, those interests of sentencing are best served by a significant term of imprisonment. The defendant's pattern of deception, and his attempts to minimize certain aspects of his conduct even now, should be met with punishment that holds him accountable for the full measure of his criminal conduct.

Crimes of fraud, and in particular fraud in connection with political donations, are committed in secret and hidden from victims, and are therefore difficult to identify and prosecute. Here, detection was particularly difficult for two reasons. First, small-dollar political or charitable contributions are often donated with little scrutiny or subsequent follow-up. Second, and related, as described above, the defendant hid his scheme by hiding behind fraudulent PACs. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)).

The defendant's scheme here, like many white collar offenses, involved a high reward and a low risk of detection. To deter such conduct, the penalty for those caught must be sufficient to alter this risk analysis. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to the expected benefits of a crime and hence the punishment required to deter it."). A meaningful sentence in this case will forewarn others that this kind of conduct is serious, significant, and intolerable.

Even more importantly, despite the defendant's advanced age, specific deterrence is a very real consideration in this case. This is the defendant's *fifth felony conviction* for fraud offenses. He unquestionably has not learned his lesson from four prior years-long prison sentences, and he remained fully able and willing to defraud thousands of victims even as an 80-year-old man. The defendant's crime here did not require youth, strength, agility, or other physical ability; all he needed was a computer and access to the internet. And even after committing the fraudulent scheme and identity theft, the defendant committed the additional crime of jumping bail. Accordingly, the defense argument that "[t]he elderly pose less of a danger to society than other individuals," Def. Mem. at 10, is utterly inapplicable to this *particular* defendant, who has *already* committed multiple federal crimes into his 80s.

In sum, the nature of the defendant's conduct shows the appropriateness of a sentence within the Guidelines Range as a means both to promote respect for the law and to deter future abuses by other individuals seeking to defraud individuals seeking to donate to worthy causes. *See* 18 U.S.C. § 3553(a)(2)(A) & (a)(2)(B). The Government joins the recommendation of the United States Probation Office, *see* PSR at 27, that the Court impose a sentence within the stipulated Guidelines Range.

## **Conclusion**

For the reasons set forth above, the Government respectfully submits that a sentence within the stipulated Guidelines Range of 75 to 87 months is appropriate here and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
December 4, 2021

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Alex Rossmiller
Assistant United States Attorney
(212) 637-2415

Cc:   Zawadi Baharanyi, Esq., *counsel for defendant* (via ECF)