M4E5dupS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          19 Cr. 444 (RMB)
                                            Remote Proceeding
 5   JOHN PIERRE DUPONT,

 6              Defendant.

 7   ------------------------------x

 8                                          New York, N.Y.
                                            April 14, 2022
 9                                          9:25 a.m.

10   Before:

11                     HON. RICHARD M. BERMAN,

12                                          U.S. District Judge

13
                              APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  ALEXANDER ROSSMILLER
          Assistant United States Attorney
17
     FEDERAL DEFENDERS OF NEW YORK
18        Attorneys for Defendant
     BY:  ZAWADI BAHARANYI
19

20

21

22

23

24

25
```

M4E5dupS

1                    (Case called; The Court and all parties appearing via

2        video conferencing)

3                    THE COURT:  Good morning, everybody.

4                    I guess we will start over, so to speak.  We had begun

5        last time and there was supplemental information that I wanted

6        to review and so I think I am up to speed now.  Let's just

7        confirm, the defense submission dated 11/24/21 requested a

8        virtual or remote hearing and we are proceeding by video

9        conference today, and that has to do with Mr. DuPont's medical

10       issues.  He is in a nursing home and is that still the position

11       of the defense, that we should waive opportunity to have

12       sentence in Court?

13                   MS. BAHARANYI:  That is correct.  Given the pandemic

14       and increase in COVID numbers and his physical status, we ask

15       to proceed remotely today.

16                   THE COURT:  Mr. DuPont is agreeable to waiving his

17       right to be in court?

18                   MS. BAHARANYI:  Yes, your Honor.

19                   THE DEFENDANT:  Yes, I am.

20                   THE COURT:  Mr. Rossmiller, is that OK with you?

21                   MR. ROSSMILLER:  Yes, your Honor.  No objection from

22       the government.  Thank you.

23                   THE COURT:  And it is true that there are still some

24       restrictions in entering and exiting the court house, although

25       we could and we have been doing actual submissions, we have

M4E5dupS

1    also been doing some virtual proceedings still.

2            During the last proceeding, which was March 22, 2022,

3    it was brought to my attention that there was a new submission

4    from the defense dated March 17, 2022 which I had not seen.  I

5    have had the opportunity to review that submission and feel

6    comfortable going forward today.  In sentencing, as I think

7    everybody knows, the United States Sentencing Guidelines are

8    not and have not been mandatory for -- since the mid-2000s,

9    2005, 2006, and 2007, and instead of mandatory guidelines we

10   fashion a sentence by reviewing the factors at 18, United

11   States Code, Section 3553(a), which I have done several times

12   in this proceeding, and these factors include the nature and

13   the circumstances of the offense or crime, the history and

14   characteristics of in this case Mr. DuPont, and the need for

15   the sentence imposed to reflect the seriousness of the offense,

16   to promote respect for the law, to provide a just punishment,

17   to afford adequate deterrence to criminal conduct, to protect

18   the public from further crimes of the defendant, and to provide

19   the defendant with needed educational or vocational training

20   and, in particular in this case, medical care or other

21   correctional treatment in the most effective manner.  In doing

22   all of that we look at the kinds of sentences that are

23   available, the kinds of sentence and the sentencing range

24   established under the guidelines even though, as I say, they

25   are no longer mandatory.  We look at any policy statements that

M4E5dupS

may have been issued by the sentencing commission that apply.
We seek to avoid unwarranted sentence disparities among
similarly situated defendants and, in appropriate cases, to
provide for restitution.

          We always start with a guidelines analysis, again even
though the guidelines are not mandatory, and here the offense
level is 23, in my opinion, the guideline range is 51 to 63
months of incarceration, plus two additional years, that is to
say 24 months consecutive, and therefore the guideline range is
actually 75 to 87 months of incarceration and the Criminal
History Category is II.

          The second count, the aggravated identity theft
carries a two-year consecutive term of incarceration.  On July
29, 2021, Mr. DuPont pled guilty before me to Counts One and
Two of the indictment, that is to say, wire fraud and
aggravated identity theft.  He pled guilty pursuant to a
written plea agreement which was dated June 17, 2021 in which
there is a stipulated -- meaning agreed to -- guideline range
of 75 to 87 months of incarceration; that's the range, a range
of 51 to 63 months on Count One, followed by 24 months
consecutive on Count Two.

          On July 29, 2021, I signed, after the parties had a
consent preliminary order of forfeiture money judgment as to
Mr. DuPont in which the parties agreed to the forfeiture and
money judgment in the amount of $245,000 in U.S. currency, and

M4E5dupS

1    that represented the amount of proceeds traceable to the

2    offense charged in Count One of the indictment that defendant

3    had personally obtained.

4           Mr. DuPont is 83 years old, he is single at this time,

5    and has two adult children and four grandchildren.  He

6    maintains a relationship with his son and his son's children

7    and his former wife.  He appears to be estranged from his

8    daughter and her family.  He has some contact with -- social

9    contact with women with whom he had been romantically involved

10   in the past.

11          Defense counsel advised the Court that he attended

12   St. Anthony's High School in Long Beach, California, and

13   graduated in 1956.  He received a bachelors degree in math from

14   Long Beach State College, now called California State

15   University.  He got that degree in 1959.  He received a masters

16   degree in education from the University of Southern California.

17   He also received an Associate Degree of arts in social and

18   behavioral sciences from San Diego Community College and a

19   bachelors degree in history from the University of California

20   Riverside.

21          According to the presentence investigation report,

22   Mr. DuPont grew up in an in tact family and reported to

23   Probation that he had a great, loving childhood and had in fact

24   been spoiled.  That is at paragraph 91 of the presentence

25   report.

M4E5dupS

1          He was arrested on March 18, 2019 and has been

2    detained at either the MDC or the MCC or the hospital, or the

3    Windsor Park Nursing Home where he currently resides.  This is

4    all since his arrest.

5          According to the presentence report, he has prior

6    disciplinary sanctions from a prior term of imprisonment that

7    included being in an unauthorized area, stealing an institution

8    truck, and leaving the camp and refusing to take a drug test.

9          The nature of Mr. DuPont's offense is described, as

10   follows, principally in the presentence report:

11         Mr. DuPont defrauded thousands of donors who

12   incorrectly believed they were donating to legitimate Political

13   Action Committees -- otherwise known as PACs -- to the

14   campaigns of candidates in various federal and state elections

15   and to certain political causes.  Mr. DuPont took more than

16   $250,000 and/or used the money for his own purposes.  The

17   defendant never reported any of the donations he received in

18   filings required by the Federal Election Commission and the

19   donations were not directed to the campaigns or causes

20   purportedly being supported by the PACs in question and related

21   websites created by Mr. DuPont.

22         The plea agreement contains a two-level adjustment for

23   obstruction of justice and the presentence report describes

24   that conduct, as follows:

25         Mr. DuPont willfully obstructed or impeded the

M4E5dupS

1    administration of justice when he, after being arrested for the

2    offense, jumped bail and led the government open a months' --

3    that's plural -- months' long multi-state chase which included

4    Mr. DuPont renting a U-Haul and claiming to drop it off in

5    Washington state only to dump it on the side of the road in

6    Texas weeks later.  That summary comes from the presentence

7    report at paragraph 63.

8         Mr. DuPont has a prior criminal history that includes

9    the following convictions:  Mail fraud, bank fraud, money

10   laundering, false impersonation, fraud claims, unauthorized use

11   of a vehicle, grand theft of firearm, etc.  According to the

12   defense, the defendant left a prison in Oregon where he was

13   being harassed and threatened after it was disclosed that he

14   was a cooperator.  Mr. DuPont apparently shared a cell with an

15   individual charged with killing his brother and sister-in-law

16   and Mr. DuPont agreed to share information that he had learned

17   about his cell mate with federal prosecutors and testified at

18   trial.

19        The defendant suffers from a number of medical

20   conditions.  The presentence report states that as provided by

21   defense counsel, the defendant was diagnosed with unspecified

22   dementia with behavioral disturbance, seborrheic dermatitis,

23   also urinary tract infection, nausea, dry eye syndrome,

24   insomnia, gout, Gastroesophageal Reflux Disease, atopic

25   dermatitis, migraines, vitamin B-12 deficiency, anemia, type II

M4E5dupS

1  Diabetes, and stage III chronic renal disease.  These diagnoses

2  appear to have been clarified by a copy of the physician order

3  report at Windsor Park Nursing Home provided by counsel.

4  Additionally, counsel provided a list of over 10 medications

5  prescribed for Mr. DuPont.

6       The presentence investigation report relayed

7  additional information about Mr. DuPont's health, as follows.

8  This is a quote:  According to a copy of Mr. DuPont's medical

9  declaration dated April 13, 2021 provided by defense counsel

10  from Ms. Emily Kirshner MDMA of the Penn Medicine Lancaster

11  General Health located in Pennsylvania, in November 2019

12  Mr. DuPont was admitted to New York Presbyterian Hospital after

13  he fell and hit his head on a toilet while incarcerated.  After

14  10 days it was determined that Mr. DuPont could not return to

15  prison due to his weakness and debility.

16       From November 20, 2019 to March 12, 2020, Mr. DuPont

17  was admitted to Kingsbrook Jewish Medical Center after

18  complaints of unsteady gait, motor weakness, and excessive

19  migraines.  He was then transferred to Windsor Park Nursing

20  Home.

21       Ms. Kirshner reported that Mr. DuPont is frail and

22  deconditioned due to a number of medical conditions.  Because

23  of his frailty, Mr. DuPont lost over 30 pounds in under a year.

24  Ms. Kirshner noted he has moderate dementia, chronic pain,

25  neuropathy, type II mellitus, may need gallbladder procedures

M4E5dupS

and other medical issues.  It was further reported that because
of Mr. DuPont's overall decline in medical health, the
defendant is unable to function independently.  She indicated
that he is at high risk of worsening and will continue to
decline.

In addition to his medical declaration, the defense
counsel provided a copy of Mr. DuPont's life expectancy which
was assessed by Scott J. Kush, MD JDMPH of the Life Expectancy
Group located in Menlo Park, California.  Based on the
defendant's medical history, Dr. Kush reported that Dupont has
a life expectancy to be approximately four additional years as
of the date of the report which was July 13, 2020.

Mr. DuPont has a prior employment history that
includes owning a tax business and buying and selling mobile
home parks.  He has been retired since 2002 and receives social
security benefits and disability benefits.  He reported to
probation that he is a master chess player.

By submissions dated November 24, 2021 and December
16, 2021, the defense requests a sentence of time-served.
These submissions were further supplemented by submissions
dated January 7, 2022 and March 17, 2022, and the defense
argues that a sentence of time-served is warranted due, among
other things, to Mr. DuPont's age, ill health, and conditions
of confinement including conditions during the pandemic.

In the March 12, 2022 submission, defense counsel

M4E5dupS

1    provides a lengthy chronology -- chronological history of

2    Mr. DuPont's incarceration of health and the summary starts on

3    October 27, 2019, which is the date of arrest of Mr. DuPont who

4    was arrested in Oklahoma City, Oklahoma, and it goes through

5    January 20 -- I'm skipping the intermediary time periods and

6    what happened during those times -- it goes through January 20,

7    2022 when Mr. DuPont was taken to New York-Presbyterian

8    hospital after complaining of chest pains.  He was treated with

9    nitroglycerin at that point in time.  He requested to be

10   discharged because he wanted to be treated at Long Island

11   Jewish Medical Center and he was returned to Windsor Park

12   Nursing Home where he remains at this time in the custody of

13   the U.S. Marshals.

14          According to defense counsel, Windsor Park Nursing

15   Home is both a nursing home and a jail for the defendant.  He

16   is shackled by his legs at all times, the shackles are attached

17   to his bed.  There are two guards who monitor him at all times.

18   He is escorted in any common area inside the nursing home and

19   is not permitted to go to the courtyard or the garden area.

20          Defense counsel acknowledges that defendant has not

21   been at the MCC or MDC -- these are jail facilities located in

22   Manhattan and Brooklyn, respectively -- since November 2019, so

23   that means from the time of his arrest in October 27 of 2019,

24   starting in November 2019, if I understand this correctly, he

25   has not been in MDC or MCC but defense also notes that he has

M4E5dupS

not been at liberty for the last 28 months now, approximately

29 months.

          In a prior submission, defense counsel noted that

Mr. DuPont has several serious physical ailments including

Stage III chronic kidney disease, Type II diabetes,

debilitating migraines, arthritis, gallstones, kidney stones,

and gout.  Defense counsel also advised the Court that coronary

artery bypass surgery was recommended, however Mr. DuPont and

his son declined surgery due to his age and risk of

complications.

          Defense counsel describes his childhood as idyllic.

Defense counsel notes that the defendant's adult years have

been wrought with instability brought by defendant's own

reckless decision making.  According to the defense, at one

point in his life the defendant earned millions of dollars and

had a reputation as a top financier in California, however

Mr. DuPont's company defrauded investors, filed bankruptcy, and

Dupont was convicted and imprisoned.  Defense states that after

that, his wife divorced him and he had a strained relationship

with his children.  He also found it difficult to obtain and/or

maintain legitimate employment and he continued committing

crimes and serving terms in prison.  According to defense

counsel, the defendant never recovered from losing everything

and causing his family to lose everything.  That can further be

examined at the defense submission at page 7, the submission

M4E5dupS

1     dated March 17, 2022.

2            With regard to the instant offenses, defense counsel

3     states that some of the money went towards fundraising calls

4     and flyers for legitimate candidates but defense acknowledges

5     that much of it did not.  According to the government's

6     December 4, 2021 submission, the government found no evidence

7     that any of the money went to legitimate purposes.

8            Defense counsel describes the offense as far less

9     egregious than many wire fraud and aggravated identity theft

10    schemes in that this is not a case where victims were defrauded

11    out of their life savings or retirement.  Defense counsel

12    argues that the average donation amount was $100 and most from

13    one-time donors.  I guess the import of that, those remarks

14    from the defense, is that it is not no harm no foul, but if the

15    defrauded amount is less than $100 and it is from a one-time

16    donor, I guess the implication -- well, we will hear from

17    defense but it seems to suggest that there is some minimization

18    here of the fraud.

19           Defense counsel, in my opinion, fails to note that it

20    is just how massive.  How massive the scheme was is not brought

21    up by the defense.  It spanned several years, it utilized

22    approximately 15 different websites -- this is the scheme of

23    Mr. DuPont -- it received more than 1,000 donations and the

24    donations totaled $250,000.  I have to say that, personally, I

25    regard that as egregious and serious.

M4E5dupS

1          Defense counsel notes that while the defendant was

2     incarcerated for this offense, his son has resumed a

3     relationship with him and has agreed to be an integral part of

4     defendant's re-entry plan.  According to the defense, the

5     defendant's son is prepared to welcome his father into his home

6     upon his release and to help him transition to a nursing home

7     or senior living facility near him.  There is a letter enclosed

8     as Exhibit A from Mr. DuPont's son, John Rinaldo, to this

9     effect.

10          By submission dated December 16, 2021, the defense

11     states that an updated life expectancy report was prepared for

12     Mr. DuPont that estimates that he is expected to live an

13     additional 2.6 years with a median survival time of two

14     additional years.  This updated report was prepared by the same

15     Dr. Kush, and is dated December 9, 2021, and the defense argues

16     that a guideline sentence in this case would result in the

17     likely death in prison of Mr. DuPont and defense counsel argues

18     that Mr. DuPont's life is drastically different now than it was

19     at the time of the offense and far different from his life of

20     30 to 40 years ago when he incurred his prior convictions.

21          I note that in his January 7, 2022 letter, he confirms

22     that if the defendant were sentenced to time-served, the

23     defendant's son John Rinaldo would fly to New York City in

24     order to transport the defendant to his home in California and

25     Mr. Rinaldo would seek to a find long-term care facility for

M4E5dupS

1    his father.  And in the March 17th submission from the defense,

2    defense counsel points out that defendant's son is 51 years

3    old, Mr. Rinaldo is a registered nurse and an administrator at

4    a Kaiser Permanente Urgent Care Facility in Ventura,

5    California.  Mr. Rinaldo has also been employed as a medical

6    counsel.  Mr. Rinaldo also apparently received a law degree

7    from Western State University College of Law in 2014.

8    Mr. Rinaldo advised defense counsel that his father could live

9    with him until he has secured a placement in a facility for his

10   father.  According to Mr. Rinaldo, the defendant would have to

11   enroll in Medi-Cal, and once his insurance is in order,

12   facilities would be able to make a determination about a bed

13   availability for Mr. DuPont.  That's found in the defense

14   submission dated March 17, 2022 on page 6.

15           By submission dated December 4, 2021, the government

16   requests a sentence that is within the stipulated guideline

17   range of 75 to 87 months.  The government contends that

18   defendant's underlying conduct in this case was calculated,

19   sophisticated, and predatory, and that his conduct following

20   his arrest, which we haven't gotten to yet, was significantly

21   obstructive.  Over the course of years -- this is going back to

22   the first count -- from approximately 2015 up until his arrest

23   in 2019, Mr. DuPont defrauded more than 2,000 victims of nearly

24   a quarter of a million dollars.  In short, the defendant set up

25   fraudulent Political Action Committees and falsely impersonated

M4E5dupS

1  campaigns and candidates to initially solicit and then to steal

2  donations to these caused and campaigns.

3          Now we come to the obstruction which every time I read

4  about it I am fairly astonished but I think I have it pretty

5  clear in my head what happened.  So, this is regarding the

6  two-level obstruction of justice enhancement which requires a

7  two-year consecutive sentence.

8          The government describes what happened as follows:

9  After being charged in this case, the defendant was arrested in

10 California on March 18, 2019.  He was presented on March 19,

11 2019, and following the presentment, the defendant was released

12 on conditions of bail and was ordered to appear in the Southern

13 District of New York on March 25, 2019 at 10:00 a.m.

14         Mr. DuPont signed an acknowledgment of defendant --

15 that's a form -- in which he agreed to the terms of his bail at

16 the time he was released including that he was aware of the

17 conditions of release, and promising to obey all conditions of

18 release and to appear as directed.  Rather than appearing --

19 this is from the government's submission.  Rather than

20 appearing as required in the Southern District of New York,

21 Mr. DuPont fled, leading law enforcement officers on a months'

22 long chase and employing sophisticated means to avoid capture.

23         On March 23, 2019, just days after the defendant was

24 released on bail, he apparently rented a U-Haul truck at a

25 location in Arizona which was nearly 90 miles away from his

M4E5dupS

1    home.  He rented the "moving van truck" with capacity to tow

2    his Mercedes Benz sedan which had been purchased with the

3    proceeds of his fraud, and he entered into a contract with

4    U-Haul for a one-way trip to Tukwila, Washington to arrive

5    there on March 28, 2019, three days after he was scheduled to

6    appear in the Southern District of New York.  Tuckwila is

7    approximately 1,300 miles from the defendant's home and is a

8    short drive to the Canadian border.  This stated destination,

9    however, was a ruse -- this is from the government's

10   submission -- presumably designed to mislead law enforcement.

11   In fact, the defendant drove to Texas, not to the state of

12   Washington, where the U-Haul truck was found abandoned in late

13   March, 2019.

14          In the months' following the defendant's flight, he

15   was identified following the use of credit and debit cards,

16   surveillance video, license plate readers and other methods as

17   having traveled at least in California, Arizona, New Mexico,

18   Texas, and Oklahoma, and on October 27, 2019, after more than

19   seven months of eluding law enforcement, the defendant was

20   driving a Honda CRV in Oklahoma and was pulled over for failing

21   to stop at a stop sign.  In that traffic stop the defendant

22   claimed falsely that his name was John Reynolds.  Subsequently,

23   in response to being asked his name during booking, the

24   defendant stated, again falsely, that his name was Michael

25   Reynolds.

M4E5dupS

1    So, one thing I am curious, and would like to hear

2    from the defense, if you could, and that is in this -- first of

3    all, if this scenario that I have described of, with the U-Haul

4    and presumably going to Washington after the date that he is

5    due in New York and winding up in Oklahoma, if any of that, you

6    know, wild goose chase I think is a fair way to describe the

7    situation, if any of that or most of it or all of it is

8    reconcilable with this enormous list of his medical

9    disabilities, or did all of those medical disabilities first

10   appear upon his ultimate arrest for the traffic violation

11   seems -- I'm not suggesting he doesn't have those medical

12   conditions, but it seems from this, again, wild goose chase, to

13   be a person of, it would appear, great physical stamina and --

14   but, anyway, so that is something, maybe I'm

15   misinterpreting what happened.  I would like to hear defense

16   counsel's point of view.

17   MS. BAHARANYI:  Your Honor, would you like me to

18   respond later?

19   THE COURT:  Yes, sure.

20   The government acknowledges -- and I do too, by the

21   way -- that Mr. DuPont's age and health circumstances are

22   definitely meaningful, indeed are mitigating factors going

23   toward a sentence, but the government also argues that they are

24   nevertheless far outweighed by the aggravating considerations

25   of both the offense here and the defendant's very significant

M4E5dupS

criminal history.  That's a quote from the government's

submission.

          And the government also argues that even at an

advanced age Mr. DuPont has -- this is a quote too -- not

learned his lesson from four prior years-long prison sentence

and he remained fully, able, and willing to defraud thousands

of victims even as an 80-year-old man.  The defendant's crime

here did not require youth, strength, agility, or other

physical ability.  It strikes me that his -- the escapade with

the U-Haul did require some of those characteristics.  All he

needed was a computer and access to the Internet.  And even

after committing the fraudulent scheme and identity theft, the

defendant committed the additional crime, I would suggest,

physically tasking crime, of jumping bail.

          You will recall at my request during the conference on

January 10, 2020, the government submitted additional

information and in the letter dated January 28, 2022, as to the

bail jumping offense committed by Mr. DuPont, the government

states that Mr. DuPont was charged with, by complaint in this

District, with committing wire fraud and aggravated identity

theft on March -- this is when he was charged -- on March 13,

2019, and was arrested in or around his home in California on

March 18, 2019.  He was presented on the complaint the

following day, March 19, 2019, in the neighboring District of

Arizona where he was released subject to certain conditions set

M4E5dupS

1    by the magistrate judge.  The relevant order required the

2    defendant to next appear in the United States Court House at

3    500 Pearl Street -- in which I am currently located -- New

4    York, New York, on March 25, 2019 at 10:00 a.m. or as directed

5    by counsel.  And it also set forth that defendant was being

6    released on unsecured bond in the amount of $100,000.  That's

7    found in the government's letter dated January 28, 2022.

8              And then I won't rehash it, the government -- if I

9    bring it up and when the government speaks there is a further

10   description, once again, of this bail jumping thing episode --

11   escapade -- wild goose chase, whatever you would like to call

12   it:

13             So, I have also reviewed the presentence investigation

14   report in this case, it was prepared on September 21, 2021,

15   together with an addendum dated October 14, 2021, and the

16   sentencing recommendation approved on October 14, 2021, and I

17   do have the correspondence from the defense dated November --

18   no, dated -- yes -- dated November 24, 2021; December 16, 2021;

19   January 7, 2022; and March 17, 2022; and correspondingly dated

20   from the government December 4, 2021 and January 28, 2022, from

21   Mr. Rossmiller.

22             So I would ask at this time defense counsel and

23   defendant whether they had the opportunity to read and discuss

24   the presentence investigation report, the addendum, and

25   sentencing recommendation.

M4E5dupS

1          MS. BAHARANYI:  Yes, your Honor.

2          THE COURT:  Mr. DuPont, you went over that presentence

3    investigation report -- do we have Mr. DuPont?

4          MS. BAHARANYI:  Can you see him, your Honor?  He is

5    seated next to me.

6          THE COURT:  I cannot.

7          MS. BAHARANYI:  Oh.

8          THE COURT:  I can see his left shoulder but -- yes.

9    There he is.

10         Mr. DuPont, have you been over that presentence

11   investigation report with your counsel?

12         THE DEFENDANT:  Yes.  My counsel reviewed it with me.

13         THE COURT:  OK.  Did you in fact read it?

14         THE DEFENDANT:  No.

15         THE COURT:  You did or did not?  It would be unusual,

16   perhaps, if you did not read it.

17         THE DEFENDANT:  Yes.  I went over it and read it.

18         THE COURT:  OK.  And do either of you, starting with

19   defense counsel, have any objections to the content of that

20   report?

21         MS. BAHARANYI:  Your Honor, none beyond what we have

22   already provided to probation.

23         THE COURT:  And how about any objections from

24   Mr. DuPont?

25         THE DEFENDANT:  No.  No.

M4E5dupS

1          THE COURT:  Hearing no additional objections, I intend

2     to return that report to the probation department, that is our

3     practice, and I am happy at this time to hear from defense

4     counsel and from Mr. DuPont and from the government.  And if

5     you have the opportunity or the occasion, if you could respond

6     to at least that one question that I raised about the

7     obstruction and whether that implicated, in any way, any

8     physical disabilities that Mr. DuPont has.

9          MS. BAHARANYI:  Yes, your Honor.  I am moving the

10    computer close to ensure that the Court can hear me.

11    Mr. DuPont remains seated beside me.

12         THE COURT:  It is helpful to see Mr. DuPont in the

13    proceeding.

14         MS. BAHARANYI:  Sure.  As long as you are able to hear

15    me.  I didn't want to --

16         THE COURT:  Yes.

17         MS. BAHARANYI:  Right now I am away from the laptop.

18         THE COURT:  I can hear you but I still can't see

19    Mr. DuPont.

20         MS. BAHARANYI:  Your Honor, to start with the question

21    that you posed, essentially what happened between October 27,

22    2019 and what Mr. DuPont now, over the past two years, what

23    Mr. DuPont experienced between his arrest and his

24    incarceration, the early days of his incarceration at the MCC

25    of New York was a fall that led to a series of other serious

M4E5dupS

1    health events.  The fall in November 2019 your Honor, is one in

2    which he was taken to the hospital for a concussion and

3    following that experienced weakness, frailty, and was submitted

4    to Kingsbrook Hospital for a number of months.  But that's not

5    the only serious physical event that he experienced after his

6    arrest.

7         I think what the Court has seen in our submissions and

8    what I want to highlight are the cardiac issues that have now

9    arisen since October 2021.  That is not something that he was

10   experiencing prior to his arrest in March, April, May 2019.  He

11   did not have cardiac arrest, he did not have a failing heart.

12   Now, perhaps there were underlying issues there but he had

13   never been hospitalized from his heart failing until October

14   2021.  At that time, your Honor, they performed -- they kept

15   him in the hospital for three weeks first.  They performed

16   surgery or attempted to perform surgery to stent his blocked

17   arteries.  One of those blocked arteries is nicknamed the widow

18   maker.  The widow maker, essentially, is a particular artery

19   that is notorious for causing death for whom it is blocked.

20   They were able to stent one of his arteries as reflected in our

21   paperwork.  They were not able to stent the widow maker.

22        So he is still in this position, your Honor, where

23   every day is essentially a precarious day for him.  His heart

24   is far weaker than it ever was.  He was supposed to have been

25   taken for a follow-up appointment with the cardiovascular team

M4E5dupS

1   at Long Island Jewish Medical Center but either because of

2   issues with the nursing home or marshal transport, that has not

3   happened yet.

4           THE COURT:  Is it true or is it -- am I

5   misunderstanding that Mr. DuPont has rejected, and his son,

6   further heart surgery?

7           MS. BAHARANYI:  So not that they rejected it.  They

8   were proposing a particular type of surgery in October 2021,

9   open heart surgery.  That is one type of procedure to address

10  blockage but it is the riskiest type of procedure for someone

11  his age.  There are far less evasive procedures to go into the

12  heart that unfortunately Long Island Jewish Medical Center

13  could not do for him so he -- and truly his son who is also on

14  the line, your Honor, and I will note has been on the line for

15  each of our hearings --

16          THE COURT:  Oh, I didn't realize.  He is certainly

17  welcome to be here.

18          MS. BAHARANYI:  Yes.  He has been listening in.  He

19  was here in March and also in January, but he and his son made

20  the decision that they wanted to be able to get this procedure

21  done in a more minimally invasive way that is less risky to

22  Mr. DuPont, his father, when he is home, if permitted.  I think

23  there is an interim procedure that is stenting that he is still

24  waiting to take place.

25          Stenting, right?

M4E5dupS

1          THE DEFENDANT:  When it was blocked.

2          MS. BAHARANYI:  Yes, that's what I was explaining, he

3  is explaining that the right was stented but the left

4  descending artery was not, that's the widow maker so that's

5  what he is still awaiting a follow-up procedure on here in New

6  York City so there are two sort of separate procedures that can

7  take place; the interim one, which is what he wants to stent,

8  and a slightly more invasive but not as dangerous procedure

9  going into his heart to actually fix the issue that he is

10  dealing with.

11          THE COURT:  Is there not a procedure where someone

12  could have heart surgery while maybe incarcerated that's less

13  invasive than open heart surgery?

14          MS. BAHARANYI:  It was not made available as an option

15  from the Long Island Jewish Medical Center which is where they

16  took Mr. DuPont in October so I don't know if it's going to be

17  made available to him at a different, better medical center

18  under the BOP.  It is a procedure that is, actually, that is

19  available to him in the community which is one of the reasons

20  why we wanted to be able to return him to his home, to his son,

21  so his son can arrange that at a proper medical treatment

22  facility.

23          THE COURT:  So my knowledge, so New York, for example,

24  is one of the heart surgery -- the places, the ultimate heart

25  surgery places in the country if not the world.

M4E5dupS

1              If we could have Mr. DuPont in the picture?  It is

2      really impossible not to be able to see him.

3              Did he and his son consult with Long Island Jewish or

4      Windsor Park or anybody about having a surgery less invasive

5      while he's in fact incarcerated?

6              MS. BAHARANYI:  They had the stent placed which is an

7      interim procedure, but my understanding is that Long Island

8      Jewish Medical Center, which is the facility he was given

9      access to while in custody, was not only able to do open heart

10     surgery to fix the issue -- hold on one moment?

11             (Defendant and counsel conferring)

12             THE COURT:  If you are talking to me, I can't hear

13     you.

14             MS. BAHARANYI:  One moment, your Honor?

15             (Defendant and counsel conferring)

16             THE DEPUTY CLERK:  Judge, I believe counsel is

17     conferring with her client.

18             THE COURT:  Yes, but it is on mute -- intentionally.

19     I see.  I see.

20             MS. BAHARANYI:  I had muted myself to have a private

21     conversation.

22             THE COURT:  I appreciate that and I understand that.

23     Yes.

24             MS. BAHARANYI:  If I may have one moment, your Honor?

25             THE COURT:  OK.

M4E5dupS

```
 1                 (Defendant and counsel conferring)
 2                 MS. BAHARANYI:  Your Honor, thank you for the moment.
 3            Mr. DuPont was explaining that the procedure he
 4      underwent at Long Island Jewish Medical Center of the stenting
 5      was the less invasive procedure option, it is just,
 6      unfortunately, it is not a permanent solution either.
 7                 (Defendant and counsel conferring)
 8                 MS. BAHARANYI:  So a little bit technical, his right
 9      descending artery is still stented, his left descending
10      artery -- which is the widow maker -- they could not complete
11      the stent on the left descending artery so he is still in a
12      position where he still has this blockage which could be
13      dangerous for him.
14                 THE DEFENDANT:  Excuse me, your Honor.  I -- they
15      wanted to do open heart surgery but I consulted with my son and
16      he consulted with the people who work with him and they said it
17      was too dangerous to open me up because if they cracked my
18      chest, I would probably just die from that.  They recommended a
19      less intrusive which is to put a stent in.  They put a stent --
20      so they scheduled me for that stent operation, they put a stent
21      in my right artery and that was successful and that can last
22      probably, I don't know, they didn't tell me but they didn't say
23      that it would -- that it was an alternative to open heart.
24      They then went into my left artery but it was so blocked that
25      they -- and I was so weak that they decided that they would
```

M4E5dupS

1    stop the procedure and that they would schedule it when I

2    was -- in several weeks when I was stronger.  That procedure

3    was done with a scope, they didn't have to crack open my chest,

4    they did it with a scope, but when they pulled the scope out I

5    started to hemorrhage and at that time I flatlined.  So they

6    said they were able to bring me back and then said we will

7    schedule again when that is stronger.  I thought it would be

8    done sooner but, unfortunately, it still hasn't been done.

9           I would like to make one other comment.  I know what

10   you have read in regards to the flight, OK, seems very

11   mysterious, she doesn't want me to tell you but number one --

12          MS. BAHARANYI:  Let me have one moment, your Honor,

13   before we go there, if you don't mind.

14          THE COURT:  I don't mind at all.

15          She wants to consult with you.

16          (Defendant and counsel conferring)

17          MS. BAHARANYI:  Your Honor, he does want to provide a

18   bit more context between the actions between March and October

19   2019 with the recognition that we do also want to refocus on

20   his health.  So we will get back to that, but he has asked to

21   address the Court on that issue.

22          THE COURT:  Sure.

23          THE DEFENDANT:  Thank you, your Honor.  I want to

24   explain what happened after I was placed on the bail in

25   Arizona.

M4E5dupS

1          I returned to my home which was 90 miles away.  I

2     returned to my home which is a trailer which I rented for $700

3     a month in the desert of California.  I returned to my home and

4     purchased a round trip ticket from Las Vegas, Nevada, to New

5     York, so that I could pursue my defense in this case.

6          I got in my car and attempted to drive there and

7     passed out.  When I woke up, I realized I had missed my plane

8     so I decided I would pack up and come to New York.  I rented

9     the van in the city that I lived in Arizona which was in

10    Blythe, California, where I lived.  I then had friends assist

11    me, I told them exactly what I was doing, I was going to come

12    to New York, and I drove on a direct route.  And if you will

13    look at it, you will see you drive through Arizona, you drive

14    through New Mexico, you drive through Texas, and you wind up in

15    Oklahoma.  I was on my way, I had another blackout.  A lady

16    rescued me, took me in her home, and that's when I realized

17    that I wasn't going to make it and so I just decided that I

18    just would try to stay there.  But I wasn't

19    jumping-jumping-jumping-jumping.  I don't know where the

20    Washington came from, I was never in Washington, I was never in

21    Oregon, I never drove to Washington.  That never happened.  I

22    drove directly from my home in Arizona, I was on a direct

23    route, and all of those states that are mentioned which are New

24    Mexico and Arizona, are all direct from my home in Blythe,

25    California, to New York.  That was what I was trying to do.  I

M4E5dupS

1   realize that I failed to do it, I made a bad choice.  I was

2   very weak and I didn't know what I was doing and, consequently,

3   I stopped in Oklahoma.  But I wasn't jumping around, I was

4   never in Washington, and I was never in the states that would

5   take me there and there is no -- I was in a direct route.

6           THE COURT:  What did you do in Oklahoma?

7           THE DEFENDANT:  What did I do in Oklahoma?

8           THE COURT:  Yeah.

9           THE DEFENDANT:  I parked the van, she had some people

10  unload it, and I went to bed.

11          THE COURT:  You what?

12          MS. BAHARANYI:  He said he went to bed, your Honor.

13          THE COURT:  Went to bed.

14          How long did you stay in Oklahoma?

15          THE DEFENDANT:  I stayed for several months.

16          MS. BAHARANYI:  So what he has explained, your Honor,

17  is he knows he should have returned to court.

18          THE DEFENDANT:  I did know it but then I had so many

19  failures, I gave up.

20          MS. BAHARANYI:  So --

21          THE DEFENDANT:  I thought I was just going to die

22  there.

23          MS. BAHARANYI:  And, your Honor, I have actually had

24  the benefit of getting a little bit more information from his

25  son as well who has been listening in to the proceeding.

M4E5dupS

1      So the name of -- and this is, again, I'm not a

2  medical doctor.  Fortunately, his son is in the medical field.

3  What had been proposed to Mr. DuPont was a form of bypass

4  surgery and that's what Mr. DuPont has explained to you as

5  well, but this -- the type of recovery or the type of procedure

6  they have been able to do that is not as invasive is called an

7  endoscopic coronary artery bypass.  It doesn't require as much

8  of a physical entry into the chest is my understanding -- and I

9  also asked Mr. Rinaldo to correct me if I am wrong as he is

10  listening -- and it is much better for someone who is frailer

11  like Mr. DuPont.  He has explained often cardiologists don't

12  recommend doing the more invasive type of bypass surgery for

13  individuals like him because of exactly what he explained, that

14  it can lead to adverse outcomes in the middle of the procedure.

15      So to your question of can they do can the BOP arrange

16  or provide access to a hospital that is able to do a less

17  invasive form of procedure, I'm not sure.  I know that the BOP

18  has been in charge of this care thus far and that has not yet

19  happened.  So all I can say is that much, your Honor.

20      I do want to return to kind of the big picture here

21  and our sort of sentencing argument.

22      THE COURT:  Hold on one second.

23      MS. BAHARANYI:  Yes.  Of course.

24      (pause)

25      MS. BAHARANYI:  So your Honor, the big picture here,

M4E5dupS

1   what we are asking for in time-served is the opportunity for

2   Mr. DuPont to live out his remaining years with family.  He

3   does not have long to live.  Dr. Kush has made that clear.  His

4   life expectancy at this point is two years and a guideline

5   range is more than double that time, your Honor.  Mr. DuPont is

6   a significantly different person than the one he was in October

7   2019 and it's not just us asserting or saying this, it is what

8   is reflected in every single medical record we obtained and

9   have provided to the Court, it is what is reflected in

10  Dr. Kush's report, it is what is reflected in Dr. Kirshner's

11  report.

12          Individuals like Mr. DuPont in their 80s, they're at

13  an older age, when they experience falls, concussions as he

14  did, this type of decline is not uncommon.

15          THE COURT:  Is not what?

16          MS. BAHARANYI:  Uncommon.  Uncommon.

17          So when elderly people fall, it is not uncommon for

18  their health to then decline.  Also, now having cardiovascular

19  issues it is not uncommon for someone to develop these worse

20  health outcomes as they age.  Mr. DuPont, we are not saying

21  everything started just in October 2019.  Absolutely not.  He

22  has suffered from kidney issues since he was a young child, was

23  hospitalized for kidney issues since he was a young child.  He

24  suffered from diabetes now for 25 years.  So it is certainly

25  not the case that, boom, now his health is poor and in all

M4E5dupS

1    these various ways but it is now certainly the case that after

2    his arrest he has experienced a particularly sharp decline in

3    his health and that part of it is due to things that we could

4    have -- he could have never foreseen when he was out in the

5    community in October, March, 2019.

6          So, these changes in his health -- and he will speak

7    to how he has used that time to reflect -- but I think these

8    changes in his health are significant to the goals of

9    sentencing as well where we are concerned, this Court is

10   concerned in fashioning a sentence to make sure that it fits

11   the offender.

12         THE COURT:  Make sure?

13         MS. BAHARANYI:  That it fits the offender.

14         THE COURT:  Yes.  No, no, no.  Of course.  I

15   understand.  Of course.

16         MS. BAHARANYI:  In this case I think a guideline

17   sentence is not proportional given who Mr. DuPont is today.  If

18   he had been in a different position, if he was still a slightly

19   healthier version of himself from March 2019, this would be a

20   different request but that is simply not the case.  He was

21   never before hospitalized because of heart failure.  That is

22   what's happened to him now in the nearly three years that he

23   has been incarcerated in the Southern District.

24         So I don't think it is hyperbole to say that we are

25   trying to avoid a death in prison sentence.  That is exactly

M4E5dupS

```
1    what it is based on; the records, based off of what experts who
2    have said who have reviewed his medical record and his state.
3    And, fortunately, we have an alternative.  The reason why I
4    pointed out to the Court that his son has been on every call is
5    I think it is important to see the kind of support he will have
6    if he is released.  I don't wish prison on anyone -- as the
7    Court is probably not surprised to hear -- but prison has had
8    the kind of positive effect of reconnecting Mr. DuPont with his
9    son, with Mr. Rinaldo.  And Mr. Rinaldo is not just a son who
10   loves his father and can just provide generic, vague support.
11   No.  He is prepared to provide a very specific kind of support
12   to his father upon release starting at the point of release.
13   We are in communication -- I am in communication with his
14   Windsor Park -- the Windsor Park staff here.  If he were to be
15   sentenced to time-served, they would coordinate with him so he
16   can actually come to New York and take his father back with him
17   to California.  He would live with his father -- sorry in
18   reverse, his father would live with him and his two sons, ages
19   8 and 9 years old, and his wife who is a dental hygienist so
20   also in the medical field although different type of medical
21   field.  He would have his own bedroom and he would remain there
22   only until his son is able to put him into the nursing home.
23   And he has explained to me a number of times -- and I have
24   explained to the Court in our submission -- that it does
25   require him being out so that he can set up the nursing home
```

M4E5dupS

1    placement.  We have already provided him with the background

2    information that he needs but what he has to be able --

3              THE COURT:  I was a little unclear about that, too,

4    and I don't really know, although I have had elderly parents.

5    One can't get a placement or a bed or a fix on where one is

6    going to go, for example, in assisted living or nursing home,

7    particularly you have to be out of jail in order to identify a

8    placement?  I find that strange.

9              MS. BAHARANYI:  He has identified potential placements

10   but he needs to be out of jail so that his California insurance

11   can cover any of those placements and they can tell him what

12   the prices will be for them to hold his father.

13             THE COURT:  Well, certainly that information is

14   available if one is a resident of California.  I mean, you

15   don't have to be in a certain place to be a resident of

16   California and to know what the rate would be in the Windsor

17   Park facility in California, for example, assuming there were

18   one.  I have no idea.  It just seems to -- it doesn't make

19   sense to me, but yeah.

20             MS. BAHARANYI:  They're not --

21             THE COURT:  Before you continue, let me just ask one

22   thing or two things.

23             First, I think I may have misspoke.  I'm not sure that

24   the obstruction is a consecutive sentence and I will hear from

25   Mr. Rossmiller if that's right or not; but second, how much

M4E5dupS

1 time has he already served?

2        MS. BAHARANYI:  He has already been in for 29 months.

3        THE COURT:  29 months.

4        MS. BAHARANYI:  And he did not plead guilty to

5 obstruction, your Honor; it's an enhancement within the

6 guidelines but it is actually not a separate sentence because

7 he didn't plead guilty to that.

8        THE COURT:  His guideline range is 75 to 87 months; is

9 that correct?

10        MS. BAHARANYI:  That is correct.

11        THE COURT:  That's with the enhancement.  Got it.  But

12 it is not -- I get it.  OK.

13        MS. BAHARANYI:  Factoring in the agg ID charge.

14        THE COURT:  Yes, I got it.

15        MS. BAHARANYI:  We are in the fortunate position that

16 Mr. Rinaldo, his son, is actually most familiar with California

17 nursing homes because of his work, and so he has already begun

18 the process for doing the research and investigation and that's

19 how I now know what is required.  I am not an expert in

20 California but fortunately his son very much is.  So with his

21 assistance, Mr. DuPont the father is going to be in a position

22 to get placed into a nursing home with his assistance upon his

23 release.

24        Your Honor, what has now occurred as Mr. DuPont

25 explained to me, a nursing home in California will allow him to

M4E5dupS

1    be closer to his family so there is a world in which we are

2    trying to ask for him to be placed permanently --

3              THE COURT:  No, I get it.

4              MS. BAHARANYI:  -- with his son.  And his son

5    understands he doesn't have the ability to take on the forever

6    long-term care of his father, but he is there to be interim and

7    he does have the connection and the resources to put him into a

8    nursing home near Ventura.  And I think that's significant too,

9    your Honor, because Mr. DuPont, with his cardiovascular issues,

10   with his dementia, with Type II diabetes, with kidney failure,

11   with gout, he will be placed in what we call a federal medical

12   center, FMC.  So he wouldn't remain at MDC or go to general

13   population at a random facility, there are exactly seven

14   facilities that are considered federal medical centers.  The

15   closest one of those to Ventura, California is in Texas, which

16   is several hours away and far difficult for Mr. Rinaldo, his

17   son, to get to in the event of any emergences or something if

18   that were to happen to Mr. DuPont.  It certainly does not

19   facilitate his ability to be connected with family, to be able

20   to receive visits from his grandsons or sons if he is

21   incarcerated in Fort Worth, Texas, far from his son and

22   grandsons.

23             So I think the limited availability of these types of

24   facilities and the availability of truly both, I believe,

25   exceptional medical care and oversight from his son in

M4E5dupS

1    California is another reason that a time-served sentence is

2    appropriate.  Of course, the Court is going to be concerned

3    about deterrence, like what message does this send if I give a

4    time-served sentence to someone like Mr. DuPont and someone who

5    is engaged in fraud and we certainly do not intend to minimize

6    the fraud.  It certainly was extensive in its reach but I think

7    there are individuals who see that Mr. DuPont was given a

8    29-month sentence with his background, with his health issues,

9    in a case that was non-violent and in a case where the

10   individual loss to folks was around $100 or less.  I think if

11   they see there was still a substantial sentence yet not a

12   guideline sentence, they will be deterred from engaging in this

13   same conduct, especially if they're younger, especially if they

14   don't have the laundry list of health issues that Mr. DuPont

15   has.  He is truly in a somewhat unique position in terms of his

16   frailty and his age and how those two interact.

17          THE COURT:  I am certainly going to take them into

18   account.  That's who he is so I am certainly going to take that

19   into Court.

20          MS. BAHARANYI:  Your Honor, I will wrap up because I

21   believe we have covered and exhausted probably the physical

22   health issues and I do think that is the primary reason why a

23   time-served sentence is warranted or appropriate, but I do want

24   to address this concern about what could he do on computers,

25   what could he do if he were given access to the Internet, that

M4E5dupS

1    reason raised in the government's submissions prior.

2              This offense was not something that was committed by

3    himself.  I think that part has not been fully explained or

4    supplied to the Court before.  He was not a lone actor, he had

5    assistance, and he had assistance from someone who is very well

6    versed in computers and technology so he was not by himself in

7    this.  Nevertheless this Court, and other Courts in this

8    district, have routinely put into place restrictions on

9    computer access or Internet access for people who commit

10   computer-based crimes, computer-based crimes like accessing

11   child pornography, distributing child pornography.  Probation

12   has ways of monitoring that conduct and can certainly monitor

13   that conduct for someone like Mr. DuPont inside of a nursing

14   home and, in our view, far more easily than for a young person

15   convicted of another computer-based offense in the community.

16   So I don't think that that concern for future potential harm

17   requires more time in custody in prison when there are other

18   less obtrusive -- truly, frankly less harmful alternatives

19   available to the Court.

20             THE COURT:  Yes.  So in point of fact, as we discussed

21   before, so if I understand the situation correctly, Mr. DuPont

22   is and has been -- you call it incarceration and it certainly

23   is, he is not free to leave, but he has been at Windsor Park

24   Nursing Home which is exactly, sounds to me, like the kind of

25   facility that he is intending and needing and planning to go to

M4E5dupS

1   except that it is not in California.  So this, by the way, is

2   the only case I have ever had, I think, where -- and I was

3   actually at the beginning, you may remember, I was a little bit

4   surprised that he was in a nursing home I guess at the

5   government's expense.

6          But in terms of the care, the treatment, the feeding,

7   the room, the cleaning, he has all of that has had -- just a

8   minute, this is my understanding -- he has all of that as long

9   as he has been in this Windsor Park Nursing Home and he has

10  hardly ever been in a jail.  You pointed that out.  So, the

11  conditions that have been afforded to him by the government I'm

12  not saying it is a good thing because he can't leave and all of

13  that, I'm not saying it is an ideal place, but it is fairly

14  extraordinary the resources that have been extended to him of

15  both resources in both living accommodation and medical care

16  for that matter.

17         So, it strikes me that the biggest difference would be

18  that he will get to see his grandchildren, you know, often.

19         MS. BAHARANYI:  Your Honor, I am glad you raised that

20  because that is still absolutely not the case, that the only

21  difference is he gets to see his grandchildren.

22         THE COURT:  I am overstating it but how many clients

23  have you had that, during their incarceration, they have been

24  placed in a nursing home or assisted living or whatever, which

25  is -- maybe I'm being a little too clear about it but which is,

M4E5dupS

1    from what I am understanding from what you have told me, that

2    he is looking for an appropriate nursing home and I'm just

3    pointing out -- I'm not saying -- so what I am saying is from

4    what I can see and what I have heard and what I have read, his

5    medical needs have been attended to.  It is not like he is

6    parked away in the MDC or the MCC.  That would be a whole

7    different story.  I think he has hardly been in either of those

8    kinds of facilities and I think it is fair and important to

9    point out that our system, as best it can, has come up with a

10   pretty humane and caring and probably expensive -- I have no

11   ideas -- facility for someone precisely -- someone who is of

12   Mr. DuPont's age and, nevertheless, is a criminal.

13              MS. BAHARANYI:  This has not been --

14              THE COURT:  You are going to say why I am wrong.

15   Let's hear about that.

16              MS. BAHARANYI:  It is something that we have -- I have

17   described in our last submission on page 5, just how the

18   conditions differ.  Right?  If he were to be placed in a

19   nursing home in California it is not just geography that

20   changes.  Every day that Mr. DuPont is in custody and has been

21   in custody while in a hospital, while in a nursing home here he

22   has been shackled to his bed.  So what that means is instead of

23   other individuals who are able to ambulate, walk around, get to

24   sort of integrate regular normal exercise into their day to

25   become stronger, to become healthier, he himself has been

M4E5dupS

1   shackled by his ankles to another bed frame in another room

2   with other inmates who are also shackled to their beds,

3   sometimes three inmates in one room with four to six guards in

4   that same crowded room.  Not only is it a COVID disaster

5   waiting to happen, but it truly shows you that this is not the

6   liberty that other individuals in nursing homes have.

7          When we met with the Court about two years ago with

8   the marshal service joining the phone call, the marshal

9   supervisor explained that they have to keep people shackled,

10  have to keep guards in the room.  Even if they're 80 years old

11  like Mr. DuPont, the shackles are necessary for limitations in

12  their movement.  They aren't allowed to go into the courtyard

13  for any fresh air, they stay inside at all times shackled to

14  their bed and he is incarcerated, it is not something we have

15  the ability to change because the marshals say that is a

16  security necessity but that has been his life.

17         When he is in the bed, when he is shackled to his bed,

18  your Honor, he has no ability to go change the TV or do the

19  things that a normal person in a nursing home would be able to

20  do.  So it truly isn't just a matter of he wants to be closer

21  to his family, he has been incarcerated.  He has felt he

22  effects of incarceration and it has had a physical effect on

23  his body as well just contributing to the frailty that

24  Dr. Kirschner explained in her report.

25         One moment, your Honor?

M4E5dupS

1          (Defendant and counsel conferring)

2          MS. BAHARANYI:  Your Honor, I think that another point

3    is -- our meeting time to be coming but another thing we want

4    to make sure the Court is aware of is he is not getting

5    high-quality medical care here to the degree he would receive

6    if he were in a placement identified by his son, monitored by

7    his son, close to his family where there is some expense of

8    accountability not just to Mr. DuPont but also family members

9    who are there, present, and love him.  Instead, we had to get

10   an ombudsman involved in his case to ensure that he is getting

11   things like proper meals.  There are appointments that should

12   have been made for him from this nursing home to go follow up

13   with his cardiovascular care that should have been made months

14   ago.  We have been harassing and talking to the nursing home

15   constantly to try to make that happen.  But this is -- I hate

16   to say it, but I think this is the consequence of someone being

17   in custody in this place, right, instead of someone being at

18   liberty and at a nursing home that they and their families have

19   been able to choose that provides a level of quality of care.

20          THE COURT:  Yes.  Don't get me wrong.  I am not

21   suggesting that I don't realize there is a difference between

22   being in custody and being at liberty.  There is no question.

23   I appreciate that and you are pointing out the differences,

24   yes.  I certainly not only appreciate it but I understand it.

25          MS. BAHARANYI:  I think there is something critical in

M4E5dupS

1    being able to choose a place that is going to be able to meet

2    his needs and that's focused on meeting medical needs.  Right?

3    He is in a position where he has a number of them, a laundry

4    list of medical needs, and his son is in a position where he

5    knows the best places possible in California to make sure that

6    he is getting the treatment that he does in fact need.  Bureau

7    of Prisons is an agency that is about detention and punishment

8    and holding people.  They're not a medical agency, that's not

9    their first priority.  They will endeavor to try to provide

10   service to individuals but because it is not their first

11   priority, they fail often.  And I don't want to see that sort

12   of failure for Mr. DuPont, who is already in such a precarious

13   physical position, frail position, and old, elderly.

14        So, your Honor, for these reasons, I know this is a

15   tough case, I know this is a difficult case in many ways

16   because it is uncommon.  There are facts here I have never

17   encountered.  I have never had such an elderly client.  I

18   actually haven't had a client in Windsor Park Nursing Home

19   although our office has had others who have been incarcerated

20   there.  But I do think that his needs now as an individual do

21   require or do warrant placement at home with his family.

22        THE COURT:  I got it.

23        MS. BAHARANYI:  Thank you.

24        THE COURT:  Mr. DuPont, you will have to move the

25   camera or tilt it.  That's better.

M4E5dupS

1          THE DEFENDANT:  Thank you, your Honor, for allowing me

2     this time to express my deep remorse for the crimes I have

3     committed.

4          As the Court is aware, I have numerous chronic health

5     conditions such as kidney failure, which I have had since I was

6     9 years old; diabetes, which I have had for the last 25 years;

7     but the one that gives me the deep pause for reflection is my

8     heart disease.  I believe you are aware I have had three heart

9     attacks in the last six months including one where my heart

10     actually stopped.  Many have noted, when faced with your

11     imminent death, your mind really focuses on your past; for me,

12     such as the criminal activities which I have pled guilty.

13          It is hard to express the deep remorse I have for this

14     conduct.  I realize that these crimes were based on the sins of

15     greed and pride.  I pray every day, off and on, for hours.  I

16     pray that God and the Court will accept my sincere remorse.

17     Fortunately, during my prayers, a calmness flooded my person,

18     assuring me God has heard and accepted my humble prayers and

19     shown mercy.

20          My doctors tell me that my left descending cardiac

21     artery is 95 percent blocked.  I could die any minute.  Here in

22     the nursing home, when I left the hospital, the doctor said you

23     have to return in about 10 days because we want to try to

24     unblock your left artery.  I have told the nursing home

25     repeatedly I have got to go back to the hospital and they

M4E5dupS

1    ignore my request.  It is 90 days when the hospital wanted me

2    back in 10 days.

3            The reason why I want to go back to California is

4    because I know I'm going to die and I want to die with my

5    family around me, I don't want to die alone.

6            Thank you, your Honor.  I am hoping you have mercy on

7    me.

8            THE COURT:  Mr. Rossmiller?

9            MR. ROSSMILLER:  Would you like to hear from the

10   government, your Honor?

11           THE COURT:  Yes.  If you wish to be heard.

12           MR. ROSSMILLER:  Yes, I do.  Your Honor, I will be, I

13   think, very brief.

14           First of all -- well, first of all, on a small point,

15   I think Ms. Baharanyi noted in response to the Court's

16   questions but I just want to confirm, the obstructive conduct

17   is taken into account in the guidelines calculation so that's

18   not a separate or consecutive sentence.  I expect to ask the

19   Court to dismiss that underlying charge at the conclusion of

20   today's sentencing proceeding so it is relevant conduct but not

21   a separate charge.

22           THE COURT:  Yes.

23           MR. ROSSMILLER:  Looking to the broader picture, the

24   government does not dispute that Mr. DuPont has serious health

25   issues that is totally appropriate for the Court to consider.

M4E5dupS

1  The Court can and should, and I am sure will take that into

2  account in its decision making, and the government has no

3  quarrel with those arguments in terms of Mr. DuPont's current

4  situation.  The Court is, I think, understandably asked about

5  the difference between the situation now versus when he was

6  committing the offenses including the bail jumping, but just

7  for the purposes of right now, the government again

8  acknowledges that there are serious health issues and that

9  those are a factor.

10        The government, nevertheless, does believe that a

11  guideline sentence would be appropriate even taking into

12  account those factors.  The government is not seeking an above

13  guidelines calculation despite the fact that Mr. DuPont has

14  committed five felony offenses throughout his life over the

15  course of decades.  We are not seeking an above guideline

16  sentence despite a lengthy flight from bail so we think the

17  guidelines calculation is appropriate here.

18        I am going to, your Honor, largely rest on our

19  submission, unless the Court has specific questions, other than

20  to say it is concerning for the government, and we submit

21  should be concerning for the Court, that Mr. DuPont remains

22  willing to not tell the truth to the Court about some of these

23  matters.  I will note, as we said in our submission, that

24  Mr. DuPont says that some of the donated funds did in fact

25  support the political candidates and campaigns by financing

M4E5dupS

1    callbacks on behalf of the candidates.  That's false.  That is

2    just not true.  There is no evidence of that.  The government

3    put in its submission four months ago, there has been no

4    evidence in response to that since is the defense argued that

5    he didn't deprive causes and candidates of "the full economic

6    support of the donations he received" or the full benefit of

7    those solicited donations.  Again, it was the entirety of all

8    of the donations that went to Mr. DuPont, certainly none went

9    to the candidates or causes and the claim that the candidates

10   were supported through the websites that provided candidate and

11   election information is also false.  The websites were

12   rudimentary, they included limited boiler plate information to

13   the extent they included quotes from the candidates, all of

14   those quotes were invented, none of them were true.

15          In terms of his explanation submitted for the first

16   time today about bail jumping, your Honor, I don't think that

17   explanation passes the smell test.  The U-Haul was rented to --

18          THE COURT:  It was hard to follow and a little bit

19   hard to grasp how that unfolded.

20          MR. ROSSMILLER:  Your Honor, I think I would say that

21   it is hard to credit.  The U-Haul was rented to be returned in

22   Washington.  There is no allegation that Mr. DuPont went there.

23   In fact, the allegation from the government is the opposite,

24   that he entered into a contract to return it in Washington

25   State.  He didn't go anywhere near there.  When he -- there has

M4E5dupS

1    been no submission to the Court of a receipt for a purported

2    round trip flight.  There is certainly no suggestion that when

3    he found out that he had missed a flight, supposedly, that he

4    tried to get on another flight.  I don't want to belabor that

5    point, I think the Court has a firm grasp of the issues there,

6    and I am not looking for further disputes about it but I note

7    that there are -- there is no particular evidence in the record

8    to back that up.

9            So given the fact that Mr. DuPont has done this or

10    something like this five times, given the fact that it affected

11    thousands of people over the course of years, given the fact

12    that Mr. DuPont appears to have, by all of the evidence,

13    engineered this scheme and given the fact that he has expressed

14    no remorse whatsoever, the government thinks that a guideline

15    sentence is appropriate.

16            THE COURT:  So just a couple of procedural matters.

17            First, defense counsel and/or the government --

18    defense counsel, really -- is there anything that is of a

19    factual nature that you would like to put in evidence or prove

20    or have a hearing with respect to -- I don't want to preclude

21    you or prevent you, or is it OK to go forward on the record

22    that is before us?

23            MS. BAHARANYI:  We are not seeking to have any sort of

24    factual hearing, your Honor.  I do think you have actually

25    heard Mr. DuPont express his remorse and express also that he

M4E5dupS

1    should have made it to New York when he didn't, so I take -- I

2    bristle a bit at that statement by the government that there

3    has been no expression of remorse, that he has denied or lied

4    about the bail jumping.  He knows he should have returned and

5    he did not and that's why we pled guilty with that guideline

6    enhancement included because he did the conduct.

7            THE COURT:  Right.  I get it.

8            MS. BAHARANYI:  So beyond that, your Honor, I think

9    the record is clear, especially with respect to the physical

10   health issues which are our primary reason for seeking the

11   below guideline sentence that we are asking for.

12           MR. ROSSMILLER:  Your Honor, if I may just respond

13   very, very briefly?  I have great respect for Ms. Baharanyi and

14   I should clarify.  I didn't mean to suggest that Mr. DuPont has

15   not expressed a lack of remorse for the bail jumping -- which I

16   think he has.  What we have seen a lack of remorse with respect

17   to is the underlying offense here of stealing hundreds of

18   thousands of dollars from thousands of donors.

19           THE COURT:  OK.

20           MS. BAHARANYI:  When he expressed his deep remorse,

21   your Honor, that was for this conduct.

22           THE COURT:  For the underlying fraud.

23           MS. BAHARANYI:  Precisely.  Precisely.

24           THE COURT:  No, I get it.

25           MS. BAHARANYI:  His greed and his pride were his exact

M4E5dupS

1    words, your Honor.

2              THE COURT:  I get it.

3              Let's see.  So I'm going to adopt the findings of fact

4    in the presentence report unless -- I think we went over this

5    before but I will try it one more time.

6              Does defense counsel have any further objections to

7    the presentence report?

8              MS. BAHARANYI:  Your Honor, no further objections.

9              THE COURT:  And none from Mr. DuPont either?

10             THE DEFENDANT:  No.

11             THE COURT:  Or Mr. Rossmiller?

12             MR. ROSSMILLER:  No, your Honor.  Thank you.

13             THE COURT:  So at this point in time I would like to

14   just take a five-minute break, or if you need more time 10

15   minutes, while I collect some thoughts in my head.  And so, it

16   is now, I have New York time 12:08, we say 12:18, so it will be

17   10 minutes and then I will finish up the sentence.

18             Is that OK with you all?

19             MS. BAHARANYI:  That's OK for the defense.  Thank you.

20             MR. ROSSMILLER:  Yes, your Honor.  The government will

21   be here so whenever the Court returns.

22             THE COURT:  Fair enough.  OK.

23             I am just going to put myself on mute.

24             (recess)

25             THE COURT:  So I will first state the sentence that I

M4E5dupS

1    intend to impose and then I will impose it.

2           I have been persuaded to give a lesser sentence than I

3    was intending to give, largely, of course, based on issues of

4    health but I am not -- I could not, in good conscience, get to

5    a time-served sentence.  I am going to impose a sentence of 42

6    months of incarceration, which is dramatically lower than the

7    low end of the guideline range -- the guideline range is 75 to

8    87 months based on an offense level of 23 and a Criminal

9    History Category of II -- that's going to be followed by

10   supervised release for three years, subject to the following

11   mandatory conditions:  that Mr. DuPont not commit another

12   federal, state, or local crime; two, that he not illegally

13   possess a controlled substance; three, that he refrain from any

14   unlawful use of a controlled substance; be required to submit

15   to one drug test within 15 days of placement on supervised

16   release and at least two unscheduled drug tests thereafter.  In

17   addition, he is required to comply with the standard conditions

18   1 through 12 which are found on pages 29 through 31 of the

19   presentence investigation report and they include, among other

20   things, that he must not own, possess, or have access to a

21   firearm, etc.  The list of 12 is readily available to you and

22   is in the presentence report.

23          And then these following special conditions which the

24   Court finds are reasonably related to the factors set forth in

25   Section 3553(a)(1), (a)(2)(B), (a)(2)(C) and (a)(2)(D) which

M4E5dupS

1    the Court also finds involve no greater deprivation of liberty

2    than is reasonably necessary for the purposes set forth in

3    Section 3553(a)(2)(B), (a)(2)(C), (a)(2)(D), and are consistent

4    with policy statements issued by the Sentencing Commission

5    pursuant to 28, U.S.C., Section 944(a).  These special

6    conditions include that defendant may only reside, upon release

7    from incarceration, with his son at his son's home, or directly

8    at a nursing home that they have selected.  Those are the only

9    two places where he may reside directly from release from

10   incarceration.

11         He will be supervised in his district of residence.

12   He is required to report to probation within 24 hours of

13   release from incarceration from custody.  He is required to

14   participate in weekly therapeutic counseling by a licensed

15   therapist.  And he is also required -- this is throughout the

16   term of supervised release -- to attend and participate in

17   weekly group therapeutic counseling headed by a licensed

18   therapist as well.

19         The emphasis, just so you know on mental health, is

20   largely in my mind, based upon his life-long criminal conduct

21   and activity and evasion.  And I found -- and find very

22   disturbing that however we -- it is the bail jumping or the

23   obstruction of justice, that kind of behavior continuing right

24   up to the very end.  So I think there is a need for individual

25   therapy and also for group therapy, each on a weekly basis, for

M4E5dupS

1    entire term of supervised release.

2              And, he may be required to contribute to the costs of

3    services rendered as by co-payment in an amount to be

4    determined by the probation officer based on such factors as

5    ability to pay or availability of third-party payment.

6              And, he is also required to provide the probation

7    officer with access to any requested financial information they

8    may seek.

9              And, he must not incur any new credit card charges or

10   open any additional lines of credit without -- are you in the

11   process, Mr. DuPont?  I don't want to disturb.

12             MS. BAHARANYI:  I'm sorry, your Honor.  We are --

13             THE COURT:  If you need time to talk, why don't we

14   take a break, but it is very disconcerting to have the

15   defendant not listening to the sentence that's being imposed.

16             MS. BAHARANYI:  I think he hears, your Honor.  We are

17   engaged.  Thank you.

18             THE COURT:  I was saying that one of the special

19   conditions is also that he must not incur new credit card

20   charges or open any additional lines of credit without the

21   approval of the probation officer unless he has completed any

22   financial obligations that arise as a result of this sentence.

23             I am not imposing a fine, I don't intend to, none is

24   recommended by the Probation Department.

25             I am intending to impose restitution in the amount of

M4E5dupS

1   $245,000.  It is payable to the Clerk of Court, Southern

2   District of New York, at 500 Pearl Street, and this is for the

3   benefit of the victims in Count One, the names of victims and

4   specific amounts owed were provided by the government I think

5   in three spreadsheets and will be forwarded to the clerk's

6   office.

7           During the term of imprisonment if he were to be

8   engaged -- it doesn't seem like this is likely, but he doesn't

9   seem to -- it doesn't seem likely that he would be engaged in

10   any employment.  If he were engaged in employment as a BOP

11   non-UNICOR work program he would be required to pay $25 per

12   quarter for the criminal financial penalties.  If he were to

13   participate in the BOP'S UNICOR program as a Grade 1 through 4,

14   he would be required to pay 50 percent of his monthly UNICOR

15   earnings toward the criminal financial penalties.  And if any

16   portion of the financial penalties, which includes the $245,000

17   restitution is unpaid following release from prison, which of

18   course is likely to be the case, then he would be required to

19   pay the balance until paid in installments of 20 percent of any

20   gross monthly revenues.

21           I have considered the factors set forth at 18, United

22   States Code, Section 3663(a)(1)(B)(i) or 18, U.S. Code

23   Section 3664 in imposing this restitution requirement.  And, in

24   any event, I believe it is agreed to by the parties.

25           There is a special assessment of $200 which is

M4E5dupS

mandatory under 18, United States Code, Section 3013.

Briefly, the reasons for this sentence.  The offense level is 23, the Criminal History is II, and the guideline range -- hold on, I am looking for not the guideline range but I know that -- I am looking for a fact sheet that I had. Anyway, the guideline range, as we said, is 75 to 87 months based on Criminal History Category II, offense level 23.  This sentence is, as you can see, is very much lower than the low end of the guideline range, 42 months, compared to the low end of the guideline range which is 75 months.  That is a very substantial variance and it is done almost entirely based on Mr. DuPont's physical ailments, his health, and his age.

I believe this sentence is appropriate given the seriousness of the offense and the needs for punishment and deterrence.  I have considered the nature and the circumstances of the crime and including the enhancement and the history and characteristics of Mr. DuPont which is, it seems, nearly life-long criminal behavior.  It is something that I have rarely encountered in all my years as a Judge and it's a little stunning to me that in fact someone would continue criminal behavior right up until the later portions of life.  It is a surprise to me and it causes me great sorrow to encounter with somebody of that nature.

I have also considered the seriousness, as I say, of the crime.  I think it is important to promote respect for the

M4E5dupS

1    law, to provide a just punishment, to afford adequate

2    deterrence to any further criminal conduct -- although I am not

3    sure I am capable of doing that in this instance -- to protect

4    the public certainly from further crimes of Mr. DuPont.  That

5    is the key to this sentence -- one of them -- and to provide

6    Mr. DuPont with needed -- particularly medical care which he

7    has been receiving up until now, and other correctional

8    treatment in the most effective manner.

9         So, I am happy to hear from defense counsel and

10   Mr. DuPont and Mr. Rossmiller again before I impose the

11   sentence.

12        MS. BAHARANYI:  Your Honor, if may have one moment?

13        THE COURT:  Sure.

14        (Defendant and counsel conferring)

15        THE DEPUTY CLERK:  Judge Berman?  This is Christine.

16        THE COURT:  Yes.

17        THE DEPUTY CLERK:  While defense counsel is

18   conferring, when defense counsel returns, could you please

19   clarify for the record if the sentence that you intend to

20   impose contains 18 months on the one count followed by 24

21   months consecutive for the aggregated identity theft count?

22        THE COURT:  Yes.

23        THE DEPUTY CLERK:  Thank you, Judge.

24        (Defendant and counsel conferring)

25        MS. BAHARANYI:  Your Honor, I wanted to clarify one

M4E5dupS

1    point stated by the Court.  In terms of his reporting upon his

2    release, typically it is 72 hours but I was not sure if that's

3    what the Court stated.

4              THE COURT:  No.  24 is what I --

5              MS. BAHARANYI:  24.

6              THE COURT:  Yes.

7              MS. BAHARANYI:  And that is to the probation office

8    upon his release.

9              THE COURT:  It says also, and I hope you all heard,

10   that when he leaves incarceration, he will be living at only

11   one of two places immediately; first is, or in either order,

12   his son's house or in a nursing home in California.

13             MS. BAHARANYI:  That part we did receive, your Honor.

14   We were just clarifying the timing.  Nothing further from the

15   defense.

16             THE COURT:  OK.  So, Ms. Murray pointed out that I

17   neglected to assign terms of incarceration to each count.  It

18   is 24 on the underlying fraud and 24 months on the underlying

19   fraud and 18 on the enhancement.

20             MR. ROSSMILLER:  Your Honor, this is Alex Rossmiller.

21             I think you mean the reverse, 18 months on the

22   underlying fraud and 24 on the mandatory fraud; is that right?

23             THE COURT:  Yes.

24             MR. ROSSMILLER:  Thank you, your Honor.

25             THE COURT:  Yes.

M4E5dupS

1           So 18, right, on the underlying fraud, and 24 on the

2      enhancement.

3           THE DEPUTY CLERK:  Judge, that's on the aggravated

4      identity theft count, correct?

5           THE COURT:  Yes.

6           THE DEPUTY CLERK:  Thank you.

7           So, did you want to add anything else, defense

8      counsel?

9           MS. BAHARANYI:  Nothing further, your Honor.

10          THE COURT:  Mr. DuPont, anything further?  I couldn't

11     hear.

12          THE DEFENDANT:  No.  Thank you, your Honor.

13          THE COURT:  Mr. Rossmiller, anything from you?

14          MR. ROSSMILLER:  Your Honor, just a couple quick

15     things.

16          I heard the Court describe that it intended to enter

17     the restitution order, it imposed a special assessment.  I

18     apologize if I missed it while I was taking notes.  Did the

19     Court describe an intend to enter, as a final order of

20     forfeiture, the previous consent order of forfeiture that was

21     submitted?

22          THE COURT:  Yes.  I don't have it in front of me, I

23     don't believe.

24          MR. ROSSMILLER:  That's fine, your Honor.  It was

25     filed on the docket, I don't think it needs to be done right

M4E5dupS

1   now but I think there will be no objection from the defense to

2   the Court entering that as a final order.

3          THE COURT:  And the amount contained in the forfeiture

4   order was what?

5          MR. ROSSMILLER:  Just a moment, your Honor.  Your

6   Honor, the PSR -- I'm sorry.

7          THE COURT:  Go ahead, I am still looking for a fact

8   sheet that I had.  Go ahead.

9          MR. ROSSMILLER:  I'm sorry, your Honor.  I am looking,

10  I have it right here.

11         THE COURT:  I think --

12         MR. ROSSMILLER:  It is $245,000; yes, your Honor.

13  Thank you.

14         THE COURT:  Just one second.

15         (pause)

16         MR. ROSSMILLER:  I should say, your Honor, just for

17  the reference, that preliminary order of forfeiture was

18  previously filed at Docket no. 53.

19         THE COURT:  In the amount of, again?

20         MR. ROSSMILLER:  $245,000.

21         Your Honor, I think after the Court imposes its

22  sentence, as the very final government submission today we will

23  ask the Court to dismiss underlying count but I will wait for

24  the moment to do that.

25         THE COURT:  Hold on one sec.  Thanks.  (Pause)  I will

M4E5dupS

1    now pronounce sentence.

2            The guideline range is 51 to 63 months on Count One,

3    and followed by 24 months' consecutive on Count Two, which is

4    the identity theft, and so I am imposing a sentence of 42

5    months which would be 18 months to Count One and 24 months to

6    Count Two, totaling 42 months together.  That is to be followed

7    by three years of supervised release, subject to the mandatory,

8    special, and standard conditions that I mentioned before and

9    incorporate that conversation and discussion here by reference.

10   There is no fine.  Restitution has been stated how it is to be

11   paid and forfeiture, as well, in the amount of $245,000 each,

12   forfeiture -- that's the forfeiture amount, and the restitution

13   amount, and the manner in which those are to be paid, same as

14   the discussion that we have had earlier and I incorporate that

15   discussion by reference as well; a $200 special assessment,

16   $100 for each count.

17           The reasons for this sentence are as I have stated

18   earlier and I incorporate that discussion here entirely by

19   reference.

20           As I said before, I find the case for a sentence

21   within the guideline range to be compelling in many respects

22   but I am persuaded that because of Mr. DuPont's age and medical

23   conditions to make this substantial variance to 42 months which

24   is way below the low end of the guideline range.

25           Does either counsel know of any legal reason why this

M4E5dupS

1    sentence should not be imposed as so stated?  Starting with the

2    defense.

3              MS. BAHARANYI:  No, your Honor.

4              THE COURT:  Mr. Rossmiller?

5              MR. ROSSMILLER:  No, your Honor.

6              THE COURT:  Then I hereby order the sentence to be

7    imposed, as so stated.

8              Mr. DuPont, to the extent that you have not already

9    waived your appeal rights -- and now I am talking about the

10   plea agreement dated June 17, 2021, in which there are

11   included -- can we move Mr. DuPont back into the picture --

12   there are included waivers of appeal on your part and in fact

13   in that plea agreement you agree that you will not file a

14   direct appeal, nor will you bring a collateral challenge

15   including but not limited to an application under Title 28,

16   United States Code, Sections 2255 and/or 2241 of any sentence

17   that is within or below the guideline range of 75 to 87 months.

18   This sentence that I have imposed is substantially lower than

19   that range so your waivers of appeal do apply certainly in this

20   case.

21             You also agreed in the plea agreement not to appeal

22   any restitution amount that is equal to or less than $245,000

23   and the restitution that I have imposed in this case is

24   $245,000, so that waiver of appeal also applies.

25             And, you also agreed in the plea agreement that you

M4E5dupS

1    would not appeal the forfeiture amount if it were $245,000 or

2    less.  This forfeiture amount in your case is $245,000, and so

3    that waiver of appeal also apples.

4         But to the extent that there is some other right out

5    there that I am not aware of, I notify you of your right to

6    appeal, such a right, and if you are unable to pay the costs of

7    an appeal, you would have the right to apply for leave to

8    appeal in forma pauperis.  And if you request, the Clerk of

9    Court would prepare and file a notice of appeal on your behalf

10   immediately.

11        Do you, Mr. DuPont, understand your waivers of appeal?

12   I can't hear you.

13        THE DEFENDANT:  Yes, your Honor.

14        THE COURT:  OK.

15        So I think then that concludes our work for today.

16        Mr. Rossmiller, you indicated there might be open

17   counts.  I forget if we resolved them at that point but if you

18   want to make that application right now again, I will make the

19   record clear.

20        MR. ROSSMILLER:  Yes.  Thank you, your Honor.  The

21   government does move to dismiss any underlying counts in this

22   case including the single count included in indictment no. 19

23   CR 791 which has been consolidated with this case.

24        THE COURT:  I will grant that application.

25        And then, starting with the government, did you wish

M4E5dupS

1    to add anything to today's sentencing proceeding?

2              MR. ROSSMILLER:  No, your Honor.  Thank you.

3              THE COURT:  How about defense counsel?

4              MS. BAHARANYI:  No, your Honor.  Thank you.

5              THE COURT:  OK.  I think that concludes our work for

6    today.

7              Mr. DuPont, I wish you the very best of luck going

8    forward.

9              Thanks very much, folks.  We are adjourned.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25